**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JUAN CARLOS EMDEN, MICHEL EMDEN, and NICOLÁS EMDEN, | § § § | |
| *Plaintiffs,* | § § | Case No. 4:21-cv-3348 |
| v. | § § | |
| THE MUSEUM OF FINE ARTS, HOUSTON, | § § | |
| *Defendant.* | § § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Juan Carlos Emden, Nicolás Emden, and Michel Emden (collectively referred to herein as "Plaintiffs" or the "Emden Heirs"), by and through the undersigned counsel, hereby bring this action against Defendant The Museum of Fine Arts, Houston (the "Museum") and as follows upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters:

**I.
INTRODUCTION**

1.      The law stands as a bulwark against the handiwork of evil, to guard for rightful owners the fruits of their labors.[1] In the years leading up to the start of World War II, Dr. Max Emden was a victim of the "handiwork of evil," the Nazi regime's systematic persecution of European Jews, which led to his sale of three valuable paintings to a buyer of artworks for Nazi leader Adolf Hitler—including a painting by famed eighteenth-century artist Bernardo Bellotto

---

[1] *Menzel v. List*, 49 Misc. 2d 300, 316, 267 N.Y.S.2d 804, 820 (Sup. Ct. 1966), modified, 28 A.D.2d 516, 279 N.Y.S.2d 608 (1967), rev'd, 24 N.Y.2d 91, 246 N.E.2d 742 (1969).

titled "The Marketplace at Pirna" bearing a unique identifying number 1025 (the "Emden 1025 Pirna"). The Emden Heirs are the rightful owners of this family heirloom that was separated from their grandfather Dr. Emden by the racist persecution of Nazi Germany and is currently in the art collection of Defendant The Museum of Fine Arts, Houston.

2.      In 1945, the Monuments Men and Women—a group of American and British museum curators, art historians and professors, librarians, architects, and artists attached to the Civil Affairs Division of the Western Allied armies—discovered the Emden 1025 Pirna in a salt mine in Austria that contained thousands of works of art destined for Hitler's *Führermuseum*. In error, the Monuments Men included the Emden 1025 Pirna in a shipment of other stolen art to the Netherlands. The Monuments Men wrote the Dutch officials requesting return of the Emden 1025 Pirna, yet the letter arrived two weeks *after* Dutch officials erroneously restituted the Emden 1025 Pirna to a German art dealer living in New York City.

3.      When the German art dealer received the Emden 1025 Pirna, he created a false provenance to make the work marketable and removed identifying labels from the back of the painting and frame that would have shown Emden's prior ownership and the *Führermuseum*'s subsequent possession. In 1952, the dealer sold the Emden 1025 Pirna under the false provenance to a prominent U.S. collector. In 1961, the collector donated the Emden 1025 Pirna to the Museum.

4.      For years, whether through choice or willful ignorance, the Museum obfuscated facts and dismissed evidence of the Emden 1025 Pirna's true provenance, refusing even to take reasonable steps common to major museums with such immense resources to confirm the correct provenance (and ownership) of the Emden 1025 Pirna including denying the Emden Heirs an opportunity to personally inspect the painting and its original frame for identifying marks.

5.      Recent new evidence proves the correct provenance of the Emden 1025 Pirna and

confirms the Emden 1025 Pirna is one of three Bellotto paintings involuntarily sold as a result of racial persecution by Dr. Emden in 1938. In 2019, the German Advisory Commission on the restitution of stolen war art (the "Commission") reviewed the Emden Heirs' claim seeking restitution of the two Bellotto paintings then in Germany's possession. Comprised of Germany's most distinguished jurists and scholars, the Commission's detailed ruling was unequivocal:

> **the policy of persecution pursued by the National Socialists therefore caused the financial ruin of Max Emden…. Consequently, there is also no doubt that the sale of the aforementioned three paintings by Bernardo Bellotto…was not undertaken voluntarily but was entirely due to worsening economic hardship ("loss of assets as a result of persecution").**

Accordingly, the Commission recommended that these two Bellotto paintings be returned to the Emden Heirs. The German government accepted the recommendation, and those Bellotto paintings were immediately returned to the Emden Heirs.

6.      Additionally, the Commission concluded that the third Bellotto, the Emden 1025 Pirna, was "of the same origin [and] was erroneously restituted to the Netherlands after 1945[…]." **In sum, but for the clerical error made in 1946 with the erroneous restitution to the Netherlands, all three Emden Bellottos would have been together, in Germany, and all three would have been returned to the Emden Heirs in accordance with the Commission's findings and recommendation.**

7.      The Museum has full knowledge of the Commission's findings, ruling, and the German government's subsequent restitution of the two Emden Bellottos, but inexplicably maintains that the Commission's decision does not "adversely impact" the Emden 1025 Pirna or the Museum's "good title." Accordingly, the Emden Heirs seek a judgment of this Court returning the Emden 1025 Pirna to them as the rightful heirs of Dr. Max Emden.

## II.
## PARTIES

8.      Juan Carlos Emden is a citizen of Chile and resides there permanently. Juan Carlos is not lawfully admitted for permanent residence in the United States. He is one of the rightful heirs of Hans Erich Emden, son of and deceased sole heir to Dr. Max Emden.

9.      Michel Emden is a citizen of Chile and resides there permanently. Michel is not lawfully admitted for permanent residence in the United States. He is one of the rightful heirs of Hans Erich Emden, son of and deceased sole heir to Dr. Max Emden.

10.      Nicolás Emden is a citizen of Chile and resides there permanently. Nicolás is not lawfully admitted for permanent residence in the United States. He is one of the rightful heirs of Hans Erich Emden, son of and deceased sole heir to Dr. Max Emden.

11.      Defendant The Museum of Fine Arts, Houston is a Texas corporation with its principal place of business located at 1001 Bissonnet, Houston, Texas 77005. Defendant can be served with process through its registered agent, Gary Tinterow at 1001 Bissonnet, Houston, Texas 77005.

## III.
## JURISDICTION AND VENUE

12.      The Court has alienage jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1332(a) because Plaintiffs are all citizens of a foreign state (Chile) and Defendant's domicile and principal place of business are both in Texas. Additionally, the amount in controversy exceeds $75,000 as measured by the value of the personal property at issue (the Emden 1025 Pirna).

13.      Further, this Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs invoke federal public law of the Holocaust Expropriated Art Recovery Act of 2016, PL 114-308, December 16, 2016, 130 Stat 1524.

---

14.     Venue is proper under 28 U.S.C § 1391(b)(1)-(2) because both the Defendant resides in and the Emden 1025 Pirna is situated in Harris County, Texas within the Southern District of Texas.

**IV.**
**KEY FACTS**

**A.     "The Marketplace at Pirna"**

15.     In the eighteenth-century, the town Pirna near Dresden, Saxony (in what is now modern Germany) was ruled by Augustus III, King of Poland and Elector of Saxony (known in the Saxon State as Frederick Augustus II). In approximately 1753, as a royal commission for Augustus, famous Italian urban landscape artist Bernardo Bellotto painted and delivered a large format painting titled "The Marketplace at Pirna" to King Augustus (the "Principal Pirna").

16.     With detailed realism, Bellotto depicts the urban landscape of the Pirna town center in "The Marketplace at Pirna." Bellotto's flawless draftsmanship paints in detail the buildings surrounding the marketplace, the hustle and bustle of its merchants and patrons, and the Sonnenstein Castle standing in the background. Additionally, as typical for the time period, Bellotto painted smaller autograph replicas of the Principal Pirna for other patrons.

**B.     The Uniquely Marked Emden 1025 Pirna**

17.     In the late 1700s, a Bellotto-painted autograph replica of "The Marketplace at Pirna" was acquired by Leipzig art collector and merchant Gottfried Winckler. Present on that painting was a collector's inventory number "1025" painted in lead white on the bottom, right hand corner. The "1025" is a unique ownership fingerprint. It was not uncommon for prominent collectors during that period to place their personalized stamp of ownership on paintings that entered their collections. The appearance, form, style and lead white color of the "1025" on this replica of "The Marketplace at Pirna" are typical of inventory numbers that appear on other

paintings in the Winckler collection and others of that time period.

18.     By 1930, prominent German Jewish merchant, philanthropist, and art collector Dr. Max Emden ("Dr. Emden") owned the Emden 1025 Pirna, along with two other Bellottos. The Emden 1025 Pirna was listed in the 1930 Galerie Caspari catalogue.

## C.     Dr. Emden's Involuntary Sale Under Economic Duress

19.     Prior to the racial persecution under the Third Reich, Dr. Emden was an owner of one of the leading department store operators in what was then the German Empire, including the world renowned KaDeWe department store in Berlin.

20.     Dr. Emden's accelerated financial decline correlates directly to the escalation of Nazi persecution of Jews via laws and regulations that sought to eliminate Jews from the German economy and strip them of their assets to benefit the Third Reich. By April 1933, the Nazi government implemented financial restrictions on Jews including Dr. Emden causing the associated loss of assets as a direct, intended result of that persecution.[2] Specifically, Dr. Emden's portfolio of securities deposited with Hamburg banks, but these funds became frozen, "blocked" accounts due to the tightening of restrictions on exporting foreign currency from 1933 onwards, and he was deprived of access to them. The same applied to the rental income Dr. Emden obtained from property that he still owned and returns from company shareholdings in Germany.

21.     In 1935, the Nazi government enacted the "Nuremberg Race Laws," which were anti-Jewish racial laws stripping those that the Nazis categorized as Jews[3] of their German citizenship in order to segregate Jews from the "pure" German, Aryan race. Beginning in April

---

[2] For an undisputed and detailed recitation of Nazi regulatory persecution of Jews starting in 1933, please refer to the United States Holocaust Memorial Museum Timeline of Events (1933-1938): https://www.ushmm.org/learn/timeline-of-events/1933-1938.

[3] The Nazi government defined "Jew" as anyone with three Jewish grandparents or someone with two Jewish grandparents who identifies as a Jew. An individual could also legally be recognized as "Jewish" if they met certain criteria defined in the Nuremberg Race Laws, such as, inter alia, being married to a "full Jew," or being a member of a Jewish congregation.

1938, all Jews were mandated to register all their property in Germany with the Nazi Government, which began forced Jewish emigration and expulsion from Germany.

22.     The Nazi policy of "Aryanization" began in 1933 and aimed to transfer Jewish-owned economic enterprises to non-Jewish or Aryan owners. Aryanization steamrolled over the years and eventually all holdouts were forced to surrender their businesses and enterprises, and/or were sent to concentration camps and/or murdered. In addition, there were the customary restrictions, harassment, and arbitrary measures taken against Jewish business owners and shareholders. The originally existing but non-transferable capital assets increasingly served to cover artificially created and nonamortizable corporate loans and fictitious tax liabilities, all of which eventually resulted in the liquidation of Dr. Emden's textile trading company, M.J. Emden Söhne and the ultimate cessation of all cash flow in Germany to Dr. Emden.

23.     By 1938, due to the culmination of this economic hardship imposed on Dr. Emden by Nazi persecution, Dr. Emden sold the Emden 1025 Pirna and the two other paintings by Bellotto[4] through Anna Caspari of the Galerie Caspari. Caspari brokered the sale of all three Bellotto paintings between Dr. Emden and Karl Haberstock. Haberstock was a German art dealer who, according to Allied interrogation reports prepared after the war by a special U.S. Army Intelligence unit, spent his "entire career based on two principles: anti-Semitism and Germanic chauvinism" and was "the most important international [art] dealer of Nazi Germany." Haberstock purchased the three Bellotto paintings from Dr. Emden on June 30, 1938. That very same day, Haberstock sold the three Emden paintings to the *Reichskanzlei* (Reich Chancellery) as they were intended for Hitler's *Führermuseum* in Linz, Austria. Dr. Emden died two years later in June 1940.

---

[4] The two other Bellotto paintings owned by Dr. Emden were titled "The Zwinger Moat in Dresden" and "The Karlskirche in Vienna." These two urban landscape scenes, like the Emden 1025 Pirna, were highly sought objects for Adolph Hitler and his *Führermuseum.* And, as detailed below, both were restituted to Plaintiffs by the German government.

24.     Each of the three Emden Bellottos received Hitler Linz inventory numbers with corresponding identifying labels applied to the back of the paintings' stretchers (the Emden 1025 Pirna was assigned the Hitler Linz inventory number "35"). All three Emden Bellottos were subsequently included in the Linz Albums, which were in total thirty-one catalogs produced for Hitler containing photographs of the works of art selected for the *Führermuseum.* Of note, the three Emden Bellottos were included in *Linz Album V* and appeared in sequence.

25.     Haberstock set a purchase price that was well below market value further confirming that Dr. Emden's sale of all three Bellottos was the result of Nazi persecution policies that forced him to sell his private assets to finance his living expenses. The agreed upon price for all three Bellottos was SFr. 60,000 (RM 34,250, or ca. RM 11,417 per painting; in U.S. dollars, the total transaction value was $13,755, or $4,585 per painting). Caspari's correspondence to Haberstock during the negotiations with Dr. Emden confirms they were capitalizing on Dr. Emden's financial distress: "We have just caught the right psychological moment, he has probably lost a lot on the stock exchange and would therefore accept this price."

26.     Additionally, the persistent low-ball offers from Caspari/Haberstock show how Dr. Emden's distress was deliberately exploited during the seven-and-a-half months of negotiations to lower the price further until Dr. Emden finally rejected any further reduction with the remark that "the price has already been brought down by more than 20 percent." In Caspari's correspondence with Haberstock in January 1938, she states how just one of Emden's Bellottos is worth more than the purchase price for all three: "I cannot imagine, however, that it is a disadvantage that a picture is just particularly outstanding, and I suspect that for this picture alone you can already get a much higher price than the purchase price for all three."

27.     Further, just a short while after Dr. Emden's involuntary sale to Haberstock, the

*Reichskanzlei*—then the Office of the Chancellor of the Third Reich acting at Hitler's command—acquired a painting "in the style of Bellotto" (thus by an artist whose name was not known)[5] for RM 15,000 on the Munich art market. Simply stated, the Third Reich paid substantially more for an inferior copy by an unknown artist than it offered Dr. Emden for the Emden 1025 Pirna painted by Bellotto's master hand.[6]

**D.     The After Bellotto Pirna of Hugo Moser**

28.     Hugo Moser was a German art dealer and collector. Dutch records purportedly show that in 1928, Moser purchased a version of Bellotto's "The Marketplace at Pirna" at Rudolph Lepke's Kunst-Auctions-Haus (an auction house in Berlin). The painting that Moser bought was in fact a work that depicted Bellotto's subject, but it was painted by an unknown artist, not by Bellotto. In the late 1700s and early 1800s, artists regularly copied Bellotto's urban landscape scenes in his style because his original works of art became even more popular and valuable after his death. These copies are referred to as "after" Bellotto.

29.     In 1933 when the Nazis came to power, Moser fled Germany for the Netherlands. In 1940, with the Nazi invasion of the Netherlands imminent, Moser again fled, this time to the United States, leaving the After Bellotto Pirna with an art restorer in Amsterdam. The art restorer died in 1943, but Moser's After Bellotto Pirna eventually found its way to the Amsterdam-based Goudstikker Gallery.

30.     On July 4, 1942, Maria Almas-Dietrich, one of the few art dealers who sold directly

---

[5] The following are accepted designations for works of art according to their maker: "By [the Artist]" is a work made by the hand of the Artist; "In the style of" is a work of the period of the Artist by a different artist but closely related to his style; "After [the Artist]" is a copy of any date of a work by the Artist by a different artist.

[6] Haberstock purchased artwork for the *Führermuseum* using a Nazi government-controlled fund from an accumulation of monies derived from the sale of artwork confiscated from German museums and private collectors, including Jews, known as the "Degenerate Art" account. Haberstock used this "tainted money" to pay for other works of art that the Nazis acquired through forced sales and persecutions. The Nazi government's thumb, hand, and fist on the marketplace for artwork further lowered the free market price of art particularly for Jews like Dr. Emden.

to Hitler, purchased the After Bellotto Pirna for Hitler's *Führermuseum* from the Goudstikker Gallery in Amsterdam. Despite having Hitler's trust, Almas-Dietrich often purchased works of art that later proved to be inferior copies, sometimes even fakes, that she then tried to sell to Hitler. In fact, after the war, U.S. Army Intelligence officers noted that she seldom, if ever, had handled an authentic major work of art. On at least one occasion, Hitler's private secretary and head of the Nazi Party Chancellery, the much-feared Martin Bormann, berated Almas-Dietrich for her poor judgement and inability to procure high quality and authenticated works of art. In fact, Hitler never acquired the Almas-Dietrich-owned After Bellotto Pirna. At war's end, the After Bellotto Pirna was found in a storage facility containing dozens of other works of art owned by Almas-Dietrich.

31.    In November 1945, the Monuments Men and Women, a group of mostly American and British museum curators, art historians, librarians, architects, even artists, responsible for preserving the artistic and cultural achievements of western civilization from the destruction of war and theft by the Nazis, confiscated all works of art owned by Almas-Dietrich and moved them to the Munich Central Collecting Point ("MCCP") acting on the assumption that some, if not all, had been stolen.

32.    The Monuments Men transported the Almas-Dietrich inventory to the MCCP where each work, including the After Bellotto Pirna, was analyzed as to artist, subject matter, and condition. The Monuments Men then made the determination that the painting Moser owned, later purchased by Almas-Dietrich, was *not* painted by Bellotto despite the similarity in subject matter. Accordingly, they attributed the work to "After Bellotto." The property card they created noted this designation along with the painting's MCCP inventory number "15872."

E.    **Post-War Discovery and Mistaken Transfer of the Emden 1025 Pirna to Moser**

33.    In May 1945, six months <u>prior</u> to the arrival of the After Bellotto Pirna at the MCCP, the Monuments Men found a salt mine in Altaussee, Austria, that contained tens of

thousands of works of art and cultural objects, including nearly 7,000 paintings, many of which were destined for Hitler's *Führermuseum*. All three Emden Bellottos were among the Altaussee horde including specifically the Emden 1025 Pirna. Like all paintings found at Altaussee, the Emden 1025 Pirna received an inventory number, "Aussee 3060."

34.     In June 1945, the Monuments Men began removing Hitler's Altaussee art horde, including all three Emden Bellottos, to the MCCP. They assigned every painting entering the MCCP an inventory number including all three Emden Bellottos. The Emden 1025 Pirna was designated MCCP inventory number "4411."

35.     In March 1946, Dutch officials notified the Monuments Men at the MCCP through Dutch Declaration Form 7056 that they were looking for a Bellotto "The Marketplace at Pirna." This declaration form, filed by the Goudstikker Gallery, who sold the "After Bellotto" painting to Maria Almas-Dietrich in July 1942, complied with the requirements of the Netherlands Art Property Foundation (Dutch: Stichting Nederlands Kunstbezit or "SNK") to provide information on lost works of art to the enemy.

36.     Accordingly, in April 1946, pursuant to external restitution policies[7] and acting on what limited information was available (including the written request from the Netherlands), the Monuments Men sent the Emden 1025 Pirna to the Netherlands believing it was the Pirna sought by the Netherlands. Again, the Netherlands communications sought a painting by Bellotto, not an After Bellotto. Because only one painting processed and identified at the MCCP fit that description

---

[7] Although no comprehensive restitution policy had yet been transmitted to military authorities in Europe, President Truman had approved the return of "readily identifiable" works of art from U.S. Collecting Points in July 1945. The following month, U.S. officials began restitution of art and cultural property from their zone of occupation in Germany. An interim restitution policy memorandum issued in September 1945 described the standard operating procedure for returning these artworks. Governments submitted consolidated lists of items taken by the Germans, providing information about the location and circumstances of their theft. U.S. authorities examined each list and permitted small missions to enter the U.S. Zone to identify the materials and undertake preparations for their return. *See* Chapter V, Restitution of Victims' Assets, PLUNDER AND RESTITUTION: Findings and Recommendations of the Presidential Advisory Commission on Holocaust Assets in the United States and Staff Report.

at that time, the Emden 1025 Pirna was included in a shipment of other stolen works of art in the Monuments Men's custody bound for the Netherlands.[8]

37.     In May 1948, Moser wrote officials at the SNK stating that he had purchased the After Bellotto Pirna from the Lepke Kunst-Auctions-Haus in Berlin in 1928. He then left the painting with Amsterdam restorer Max Fechner when he fled the Netherlands in 1940. Sometime prior to Fechner's death in 1943, Moser's brother-in-law through another art dealer sold the painting to yet another dealer, Douwes Fine Art, unbeknownst to and without Moser's permission. Moser swore he received no compensation. Douwes Fine Art then sold the painting, which by this time they had reattributed to "After Bellotto," to the Goudstikker Gallery in Amsterdam. As mentioned, the Goudstikker Gallery sold the painting in July 1942 to Maria Almas-Dietrich as a work purportedly by Bellotto.

38.     Only in 1949, when the Monuments Men gained access to information not previously available, were they able to determine that the Emden 1025 Pirna had been acquired by Karl Haberstock for the *Führermuseum*. This information, paired with Haberstock's records and Linz Album V, which had images of the three Emden Bellottos in sequence (item numbers 47, 48, and 49), tied common ownership to Dr. Emden.

39.     Realizing the identification error between the Emden 1025 Pirna and the After Bellotto Pirna, Monuments Man Stefan Munsing, chief of the "Monuments, Fine Arts, and Archives" Section of the Office of Military Government for Bavaria and director of the MCCP, wrote a letter in May 1949 to the Commissioner General for the Netherlands, Economic Recuperation, requesting the return of the Emden 1025 Pirna back to the MCCP to be properly identified as German-owned. Munsing's request arrived at a moment in time when their Dutch

---

[8] The other two Emden Bellotto paintings, like other unclaimed stolen property, were eventually transferred to the German government in 1949 for further evaluation and restitution.

counterpart operation was being closed and operations transferred to a new organization in a different city but was, nonetheless, too late: the Dutch government had already delivered the Emden 1025 Pirna to Moser.

**F.     Moser Sells the Emden 1025 Pirna to Kress After Inventing a False Provenance**

40.     In 1952, Moser sold the Emden 1025 Pirna to American collector Samuel H. Kress with the following provenance:

> I bought the painting in the Niederlaendische Palais' Unter den Linden 36 in Berlin, where all paintings from the various Hohenzollern palaces were stored after the revolution in 1918. Besides the label 'Preussische Königskrone' (Prussian Royal Crown), which is still on the back of the painting, it bore the 'General Katalogue' [General Catalog] No. 8350. This catalogue was made by Waagen[9] in the middle of the XIX century.

41.     The provenance Moser presented to Kress was completely fabricated and plainly designed to hide the fact that Dutch officials had, in error, delivered the Emden 1025 Pirna to him, not the After Bellotto Pirna he purchased in 1928. Moser used his skills and knowledge as an art dealer to create an entirely new and fictitious provenance cleverly designed to pass scrutiny from Kress. Tellingly, Moser deliberately omitted two critical and verifiable pieces of information about the After Bellotto's provenance: (1) his purchase of the After Bellotto Pirna at the 1928 Berlin auction at Lepke, and (2) the known fact that the seller at that auction was the government of the Union of Soviet Socialist Republics (USSR).

**G.     Kress Gifts the Emden 1025 Pirna to Defendant**

42.     In 1953, the Kress Foundation placed the Emden 1025 Pirna on long term loan with

---

[9] Moser falsely claimed this catalogue was prepared by G. F. Waagen in the middle of the nineteenth century. George T.M. Shackelford, a Museum curator, later asserted that this catalogue was a draft only and was destroyed by fire during the Second World War. The truth is, however, that Waagen's catalogues were widely published and distributed amongst various art history institutions throughout Germany. For instance, copies currently exist at the Kunsthistorische Institut in Bonn. Further, the existing Waagen catalogues do not reference "The Marketplace at Pirna" bearing Catalogue No. 8350. Finally, there was no sale at the Niederlaendische Palais, Unter den Linden 36 in Berlin during the time period Moser claimed he purchased his version of "The Marketplace at Pirna."

Defendant. In 1961, the Kress Foundation converted the loan to an outright donation of the Emden 1025 Pirna to Defendant.

43.     When the Museum assessed the condition of the Emden 1025 Pirna in 1987, the stretcher did not reveal an inscription of a royal gift nor a General Catalogue No. 8350 as Moser declared in his 1952 explanation of his purchase of his replica of "The Marketplace at Pirna."

**H.     2019 German Advisory Commission Confirms Emden's Sale Was a Loss as the Result of Nazi Persecution.**

44.     The German Advisory Commission on the return of cultural property seized as a result of Nazi persecution, especially Jewish property, is a group of Germany's most distinguished jurists and scholars. The Commission is led by Professor Dr. Dres. h.c. Hans-Jürgen Papier, former president of the Federal Constitutional Court (a position equivalent to the Chief Justice of the United States Supreme Court) and has included members such as a former President of Germany and a former head of the German national legislature.

45.     In 2019, the German Advisory Commission determined that Dr. Emden was a victim of the "systematic destruction of people's economic livelihoods by the Third Reich as a tool of National Socialist racial policy" and recommended that his two Bellotto paintings that had been turned over to the new German government by the Monuments Men be restituted to Plaintiffs as the sole heirs of Dr. Emden. The Commission reviewed the Plaintiffs' claim seeking restitution of the two Bellotto paintings as beneficiaries to property wrongfully acquired by Hitler and the Nazis. In a detailed ruling, the Commission found:

> **the policy of persecution pursued by the National Socialists therefore caused the financial ruin of Max Emden…. Consequently, there is also no doubt that the sale of the aforementioned three paintings by Bernardo Bellotto…was not undertaken voluntarily but was entirely due to worsening economic hardship ("loss of assets as a result of persecution").**

The Commission recommended that the two Bellotto paintings in the possession of the German

government be returned to the Emden Heirs. The Commission also noted that the third Bellotto, the Emden 1025 Pirna, was "of the same origin [and] was erroneously restituted to the Netherlands after 1945 and is now considered lost." The German government accepted the recommendation of the Commission and immediately returned both Bellotto paintings to the Emden Heirs.

46.    The Emden 1025 Pirna—the third of the three Emden Bellottos that the Commission considered "lost"—is the painting currently hanging in the Museum. The Commission recognized Dr. Emden's ownership and that the Emden 1025 Pirna was erroneously restituted to the Netherlands and thus no longer in Germany's possession, custody, or control. **According to the Commission, all three Emden Bellotto paintings belong to Plaintiffs.** Thus, but for the clerical error made in 1946 with the erroneous restitution to the Netherlands, all three Emden Bellottos would have been together, in Germany, and all three would have been returned to the Emden Heirs in accordance with the Commission findings and recommendation.

**I.    New 2021 Research by the Monuments Men Foundation for the Preservation of Art**

47.    In summer 2021, researchers for the Monuments Men Foundation for the Preservation of Art ("MMF") found new information and discovered a photograph of the Emden 1025 Pirna taken by the Galerie Caspari in 1930 at The Witt Library, Courtauld Institute of Art, London (the "Witt Photograph"). Employing modern technology, a digital analysis of the Witt photograph revealed the "1025"—a unique fingerprint of ownership. Additionally, research conducted by the MMF confirmed the Witt Photograph with a second photograph from Haberstock's archives, both of which tied this unique fingerprint to Winckler's inventory number and concretely distinguishes the Emden 1025 Pirna from Moser's After Bellotto Pirna, and all other versions.

48.    After learning of this new information regarding the Emden 1025 Pirna, the MMF

swiftly presented it to the Museum and concurrently advised that the Emden 1025 Pirna should be restituted to Plaintiffs. Despite the overwhelming evidence recently discovered, the Museum unequivocally refused restitution.

**J.      The Museum Claims Title through the Third Reich to Refuse Restitution**

49.      In light of the evidence and conclusion of the Commission, the Museum's assertion of clear title is horrific given that it emanates from the Nazi government's "purchase" of the Emden 1025 Pirna on the heels of the Nazi confiscation of Dr. Emden's liquid wealth and income sources. The Museum simply declares the transaction was "voluntary" and therefore it has clear title.

50.      Since the Museum took possession of the Emden 1025 Pirna, however, it has waffled on and then most recently removed Dr. Emden's relation to the work within its multiple versions of published provenance. Initially, a 1994 publication by the Museum included a provenance that recognized the purchase of the Emden 1025 Pirna by German art dealer Haberstock without acknowledging that he acquired the work from Dr. Emden for Nazi leader Adolf Hitler and his *Führermuseum*.

51.      A subsequent provenance published by the Museum in the 2000s acknowledged the ownership of Dr. Emden, his sale to Haberstock, and the erroneous restitution of the Emden 1025 Pirna by the Monuments Men in 1946 to the Netherlands. Then, in June of 2021, within just a few weeks after being contacted by the MMF and becoming aware of its determination that the Emden 1025 Pirna belongs to the Emden heirs, the Museum changed its provenance *again*, eliminating any reference to Dr. Emden's ownership of the Emden 1025 Pirna.

52.      Thus, the current state of the Museum's claim to ostensibly rightful title of the Emden 1025 Pirna can be summarily recited as follows:

- Winckler's "1025" mark on the Emden 1025 Pirna is visible even from the Museum's own website photo of the painting;

- After years of waffling on and conflating provenances, the Museum's most recent public statement since being confronted by the MMF's evidence acknowledges that the Emden 1025 Pirna passed through Nazi hands such as Haberstock between its ownership by Dr. Emden and its current place on the Museum's walls;

- The Museum acknowledges that the Commission determined in 2019 that the three Emden Bellottos purchased by Haberstock were involuntary sales by Dr. Emden resulting from Nazi persecution; and

- Yet the only reason the Museum will not restitute the Emden 1025 Pirna to the Emden Heirs is because the Museum chooses to rely upon a flawed and limited-scope report from 2007 instead of the Commission's 2019 decision that Dr. Emden's transfer was the result of Nazi persecution.

53.     For reasons unknown, the Museum evidently made no effort to research the origins of the 1025 inventory number, action that would have confirmed ownership by Dr. Emden. The Museum's willful ignorance is an affront to the Museum's patrons and benefactors, as well as the art world at large. Further, the Museum's rejection of the Plaintiffs' claims of rightful possession is a direct repudiation of its responsibility under federal foreign policy.[10]

54.     In his recent statement to *The New York Times*, the Museum's Director simply cited unspecified "centuries of property law" while dismissing the 2019 German Advisory Commission's conclusion as merely due to "different standards" of European governments that "participated in the atrocities against the Jews." Even setting aside the insinuation that modern Germany's conclusions were driven by guilt as opposed to years of factual and legal analysis, the Museum's response is shockingly self-unaware and shows callous disregard for the systematic racial persecution by Nazi Germany during which the transfer of the Emden 1025 Pirna occurred.

**K.     The Statute of Limitations Are Preempted by the Holocaust Expropriated Art Recovery Act**

55.     The Holocaust Expropriated Art Recovery Act of 2016 (the "HEAR Act") preempts

---

[10] Specifically, the Washington Principles, an international agreement that is a predecessor to the Terezin Declaration, identifies principles of fair play designed to compensate those wronged in the war.

state statute of limitations laws. PL 114-308, December 16, 2016, 130 Stat. 1524. The operative

provision of HEAR in Section 5 provides:

> a civil claim or cause of action against a defendant to recover any artwork
> or other property that was lost during the covered period because of Nazi
> persecution may be commenced not later than 6 years after the actual
> discovery by the claimant or the agent of the claimant of—(1) the identity
> and location of the artwork or other property; and (2) a possessory interest
> of the claimant in the artwork or other property.

56.     Additionally, when artwork is "one of a group of substantially similar multiple

artworks," then actual discovery of the identity of the artwork "shall be deemed to occur on the

date on which there are facts sufficient to form a substantial basis to believe" that the artwork

belongs to the claimant. *Id*. at § 5(b).

57.     In this case, Plaintiffs gained an undeniably substantial basis for their belief in their

rightful ownership of the Emden 1025 Pirna as of July 2021, which is well within the six years

extended statute of limitations under the HEAR Act.

## V.
## DECLARATORY JUDGMENT

58.     Plaintiffs bring this suit for a declaratory judgment under both Federal Rule of Civil

Procedure 57 and 28 U.S.C. §§ 2201 and 2202.

59.     Plaintiffs repeat and reallege each of the allegations contained in the preceding

paragraphs of this Complaint as if fully set forth herein.

60.     The Plaintiffs are the rightful owners of the Emden 1025 Pirna and are entitled to

the immediate possession of the Emden 1025 Pirna.

61.     Defendant does not have good title to the Emden 1025 Pirna.

62.     Plaintiffs demanded that Defendant return of the Emden 1025 Pirna and its original

frame. Defendant failed and refused to deliver the Emden 1025 Pirna or the frame to Plaintiffs.

63.     Accordingly, there is an actual and substantial controversy entitling the Plaintiffs

to declaratory relief as follows:

    a. Dr. Emden and/or his heirs had the right of ownership and possession of the Emden 1025 Pirna after it was discovered by the Monuments Men in 1945.

    b. Plaintiffs, as the only surviving rightful heirs of Dr. Emden, have the right to ownership and possession of the Emden 1025 Pirna today.

    c. The Emden 1025 Pirna in Defendant's possession is distinct and separate from the After Bellotto Pirna once owned by Moser.

    d. Moser did not have a right of ownership or possession of the Emden 1025 Pirna and therefore did not pass good title to the Kress Foundation.

    e. The Kress Foundation did not acquire good title to the Emden 1025 Pirna because Moser could only transfer his bundle of rights, which were none, to the Kress Foundation.

    f. Defendant did not acquire good title to the Emden 1025 Pirna because the Kress Foundation could only transfer its bundle of rights, which were none, to the Defendant.

64.    Plaintiffs are entitled to a judgment declaring them the sole, joint owners of the Emden 1025 Pirna.

## VI.
## CAUSE OF ACTION NO. 1: CONVERSION

65.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth verbatim herein.

66.    Dr. Emden's sale of the Emden 1025 Pirna was not voluntary but instead was a sale committed under specific, persistent, and material economic duress by the Nazi persecution of Dr. Emden. As found by the German Advisory Commission, this sale, along with the sale of two other paintings by Bellotto, was not voluntary and made under extreme economic hardship for substantially less than market value for three valuable paintings.

67.    Accordingly, in 1961, at the time the Defendant took ownership of the Emden 1025 Pirna, Dr. Emden's rightful heirs were the owners and entitled to immediate possession of the

Emden 1025 Pirna.

68.     Further, the Defendant acquired possession of the Emden 1025 Pirna by donation and did not pay anything of value to the Kress Foundation. Since the beginning of its possession of the Emden 1025 Pirna, the Defendant has not observed reasonable commercial standards of fair dealing. Specifically, the Defendant has not made reasonable investigatory efforts to confirm the transfer of title from the Netherlands to Moser to the Kress Foundation and ultimately to Defendant.

69.     Moreover, Moser could not and did not pass good title to the Kress Foundation; likewise, no good title passed from the Kress Foundation to Defendant.

70.     Plaintiffs' presentment of evidence to Defendant concretely establishing the identity of the Emden 1025 Pirna and Defendant's rejection of the evidence defeats any reasonable doubt, mistake, accident or innocent taking by the Defendant. Plaintiffs' own acts or omissions have not caused nor contributed to the Plaintiffs' injuries.

71.     Defendant's wrongful acts proximately caused injury to Plaintiffs, which resulted in the following damages: loss of use of the converted property, loss of profits from the converted property plus interest, and fair market value at its highest rate plus interest.

72.     Plaintiffs seek return of the converted Emden 1025 Pirna plus actual damages.

**CAUSE OF ACTION NO. 2: TEXAS THEFT LIABILITY ACT**

73.     Plaintiffs reallege and incorporate by reference the allegations set forth above, as if set forth verbatim herein.

74.     Plaintiffs bring this action under the Texas Theft Liability Act for an unlawful appropriation of property under Texas Penal Code § 31.03.

75.     Plaintiffs are the rightful owners of the Emden 1025 Pirna and are entitled to possession of the Emden 1025 Pirna.

76.     Defendant unlawfully appropriated Plaintiffs' 1025 Pirna in violation of Texas Penal Code § 31.03. Defendant possesses the Plaintiffs' 1025 Pirna without effective consent. Specifically, upon the 2021 presentment of the most recent evidence concretely establishing Plaintiffs' ownership, there is no bona fide dispute of the Plaintiffs' right to ownership and conversion began on the date of the Museum's 2021 rejection of Plaintiffs' demand to return the Emden 1025 Pirna.

77.     Defendant's unlawful appropriation was made with the intent to deprive Plaintiffs of the Emden 1025 Pirna.

78.     Defendant's wrongful conduct caused injury to Plaintiffs, which resulted in actual damages plus prejudgment and post judgment interest plus attorney's fees.

79.     Upon proof of actual damages, Plaintiffs are entitled to additional statutory damages of up to $1,000 from Defendant under Texas Civil Practice & Remedies Code § 134.005(a)(1).

80.     Plaintiffs seek damages within the jurisdictional limits of this Court.

## VII.
## ATTORNEY FEES

81.     Plaintiffs are entitled to recover reasonable and necessary attorney fees that are equitable and just under (a) Texas Civil Practice & Remedies Code § 37.009 and (b) Texas Civil Practice & Remedies Code § 134.005(b).

## VIII.
## JURY DEMAND

82.     Plaintiffs hereby demand a trial by jury of all issues so triable pursuant to FED. R. CIV. P. 38.

---

# IX.
# PRAYER

For the reasons above, Plaintiffs respectfully request that the Court find in their favor and against Defendant, and that the Court grant Plaintiffs the following relief:

a.   For declarations affirming Plaintiffs are the sole, joint owners of the Emden 1025 Pirna and an order directing Defendant to immediately return the Emden 1025 Pirna to the joint possession of Plaintiffs;

b.   Judgment in Plaintiffs' favor and against Defendant on all causes of action alleged herein;

c.   For actual damages;

d.   For costs of suit incurred herein;

e.   For prejudgment interest;

f.   For post judgment interest;

g.   For reasonable and necessary attorney's fees; and

h.   For such other and further relief as the Court may deem to be just and proper.

Dated: October 12, 2021                    Respectfully submitted,

                                           /s/ *William S. Richmond*
                                           William S. Richmond
                                           Texas Bar No. 24066800
                                           brichmond@pcrfirm.com
                                           Hillary Kramer Lynch
                                           Texas Bar No. 24055800
                                           hlynch@pcrfirm.com
                                           Nicholas C. Kliewer
                                           Texas Bar No. 24083315
                                           nkliewer@pcrfirm.com
                                           **PLATT CHEEMA RICHMOND PLLC**
                                           1201 N. Riverfront Blvd., Suite 150
                                           Dallas, Texas 75207
                                           214.559.2700 Main
                                           214.559.4390 Fax

                                           **COUNSEL FOR PLAINTIFFS**