IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUAN CARLOS EMDEN, MICHEL EMDEN, AND NICOLÁS EMDEN, | § § § | |
| | § | CIVIL ACTION NO. 4:21-CV-03348 |
| *Plaintiffs*, | § § | |
| v. | § § | |
| THE MUSEUM OF FINE ARTS, HOUSTON, | § § § | |
| *Defendant*. | § § § § | |

### The Museum of Fine Arts, Houston's Motion to Dismiss

# TABLE OF CONTENTS

Page

Nature and State of the Proceeding..................................................................................1

Statement of the Issues to Be Ruled Upon.......................................................................2

Summary of the Argument.................................................................................................3

Factual Background ..........................................................................................................5

    A.    Max Emden's Sale of the Painting.........................................................5

    B.    Post-War Restitution of the Painting .....................................................6

    C.    Plaintiffs' 2006 Claim for the Painting..................................................6

Legal Standard .................................................................................................................8

Argument .......................................................................................................................10

    A.    Plaintiffs' Claims Are Barred by the Applicable Limitation Periods ...................10

        1.    The Limitation Periods Were Not Tolled ...................................12

        2.    The HEAR Act Does Not Salvage Plaintiffs' Untimely Claims ..............12

    B.    Plaintiffs' Decades-Old Claims Are Barred by Laches ..............................15

    C.    The Act of State Doctrine Bars Plaintiffs' Claims....................................17

        1.    Post-War Restitution Programs of the Allies...............................20

        2.    The Dutch Post-War Restitution Program .................................22

        3.    Plaintiffs' Claims Would Require This Court to Analyze the Dutch Government's Restitution in Contravention of Act of State Doctrine ..............................................................23

Conclusion .....................................................................................................................25

4877-2387-9686.1

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Bakalar v. Vavra*,
   819 F. Supp. 2d 293 (S.D.N.Y. 2011)....................................................................16

*Bernardo Footwear, LLC v. Ashley Nettye, Inc.*,
   No. H-11-2057, 2012 WL 1076252 (S.D. Tex. Mar. 28, 2012) ...........................16

*Bush v. United States*,
   823 F.2d 909 (5th Cir. 1987) .................................................................................8

*Callejo v. Bancomer, S.A.*,
   764 F.2d 1101 (5th Cir. 1985) .........................................................................17, 18

*Celtic Life Ins. Co. v. Coats*,
   885 S.W.2d 96 (Tex. 1994)...................................................................................11

*City of Fort Worth v. Johnson*,
   388 S.W.2d 400 (Tex.1964)..................................................................................15

*Collins v. Morgan Stanley Dean Witter*,
   224 F.3d 496 (5th Cir. 2000) .............................................................................2, 8

*De Benavides v. Warren*,
   674 S.W.2d 353 (Tex. App. 1984)........................................................................15

*Dunbar v. Seger-Thomschitz*,
   615 F.3d 574 (5th Cir. 2010) .................................................................................9

*Dunbar v. Seger-Thomschitz*,
   638 F.Supp.2d 659 (E.D. La.2009).........................................................................9

*Exxon Corp. v. Emerald Oil & Gas Co.*,
   348 S.W.3d 194 (Tex. 2011).................................................................................12

*Fazakerly v. Fazakerly*,
   996 S.W.2d 260 (Tex. App.–Eastland 1999, pet. denied) ....................................15

*Garrett v. Commonwealth Mortgage Corp. of Am.*,
   938 F.2d 591 (5th Cir. 1991) .............................................................................2, 8

*Greater Houston Transportation Co. v. Uber Techs., Inc.*,
   155 F. Supp. 3d 670 (S.D. Tex. 2015)................................................................2, 8

4877-2387-9686.1

*Herron v. Herron*,
    255 F.2d 589 (5th Cir. 1958) ................................................................9

*Hoffart v. Wiggins*,
    1:08-CV-46, 2010 U.S. Dist. LEXIS 29010 (E.D. Tex. Jan. 30, 2010)...............................11

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    238 F. Supp. 3d 799 (S.D. Tex. 2017) ................................................8

*In re TXNB Internal Case*,
    483 F.3d 292 (5th Cir. 2007) ............................................................9

*Pearson v. American Fidelity & Casualty Co.*,
    321 S.W.2d 620 (Tex. Civ. App.-Amarillo 1959) ...............................15, 16

*Matter of Placid Oil Co.*,
    932 F.2d 394 (5th Cir. 1991) ...............................................10, 11, 12

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004).......................................................................17

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS*,
    163 F.3d 1363 (D.C. Cir. 1999) ......................................................17

*Riviana Foods, Inc. v. Golden Star Trading, Inc.*,
    No. 4:19-CV-01994, 2020 WL 6153602 (S.D. Tex. Apr. 6, 2020)........................10

*Shell Oil Co. v. Ross*,
    356 S.W.3d 924 (Tex. 2011)..........................................................12

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ............................................................3

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011) ....................................................2, 5, 9

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010) ...............................................18, 20, 21

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    897 F.3d 1141 (9th Cir. 2018) ................................................. *passim*

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*,
    493 U.S. 400 (1990)........................................................................3, 5, 17

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines.*,
    965 F.2d 1375 (5th Cir. 1992) ..........................................3, 5, 17, 18

iii

*Western Power, Inc. v. TransAmerican Power Prod., Inc.*,
316 F. Supp. 3d 979 (S.D. Tex. 2018) .............................................................2, 10

*Westworth Vill. v. Mitchell*,
414 S.W.2d 59 (Tex. Civ. App. 1967) ...................................................................15

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
296 F.3d 1154 (D.C. Cir. 2002) ............................................................................17

*Zuckerman v. Metro. Museum of Art*,
928 F3d 186 (2d Cir. 2019) .............................................................................15, 16

**Statutes**

22 U.S.C. § 2370(e)(2) ..................................................................................................19

Federal Rule of Civil Procedure 12 ..............................................................1, 3, 8, 10

Federal Rule of Civil Procedure 44.1 ........................................................................10

S. Rep. No. 114-394 (2016) (https://www.congress.gov/114/crpt/srpt394/CRPT-114srpt394.pdf).......................................................................................................14

Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524........................................................................................................ *passim*

Holocaust Victims Redress Act, Pub.L. No. 105-158, 112 Stat. 611 (1998) ................9

Texas Civil Practice & Remedies Code § 16.003(a) ...............................................2, 10

iv

**Nature and Stage of the Proceeding**

Plaintiffs Juan Carlos Emden, Michel Emden, and Nicolás Emden ("Plaintiffs") are again seeking restitution of an 18th Century painting by Bernardo Bellotto, *Marketplace at Pirna* (c. 1764) (the "Painting"), that their grandfather, Max Emden, is alleged to have owned before selling to a buyer for Adolf Hitler in 1938.  The documented 1938 sale occurred when Emden, a naturalized Swiss citizen living with his art collection on his private island in Switzerland, sent the Painting to Germany through his dealer of choice.  After extensive negotiations, the Painting was sold at a price determined by Emden and the funds were paid to him in Swiss francs, in Switzerland.  Emden died of natural causes in Switzerland in 1940.  After the war, the Painting was restituted to Hugo L. Moser according to official Allied and Dutch restitution rules and procedures.  Moser later sold the Painting to Samuel H. Kress.  The Kress Foundation donated the Painting to the Museum of Fine Arts Houston (the "Museum") in 1961.  Emden's son and heir made no claim for the Painting.

In 2006 and 2007, Plaintiffs twice sent written demands to the Museum for restitution of the Painting.  After analyzing the demands, the circumstances around the 1938 sale, and the Painting's ownership history, the Museum rejected both demands.  Plaintiffs did not file suit until 2021.  Plaintiffs now claim the Museum is liable for conversion and under the Texas Theft Liability Act ("TTLA") for rejecting their 2006 and 2007 restitution demands.

The case was filed on October 12, 2021.  Defendant executed a waiver of the service of summons on October 20, 2021, which required the Museum to answer or file a motion, pursuant to Federal Rule of Civil Procedure 12, by December 17, 2021. This is Defendant's first responsive pleading.

1

## Statement of the Issues to Be Ruled Upon

Questions: (1) Whether Plaintiffs' claims are barred by the applicable statutes of limitation or laches. (2)  Whether Plaintiffs' claims are barred by the act of state doctrine.

**Standard of Review.**  When considering a motion to dismiss, the Court accepts the plaintiffs' allegations as true.  *Greater Houston Transportation Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 692 (S.D. Tex. 2015).  Dismissal is warranted if the bar to relief appears on the face of the complaint or other appropriately considered materials.  *See, e.g.*, *Garrett v. Commonwealth Mortgage Corp. of Am.,* 938 F.2d 591, 594 (5th Cir. 1991) (finding claim to be time barred); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 945 (5th Cir. 2011) (finding that the act of state doctrine warranted dismissal); *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99 (5th Cir. 2000) (holding that Court may consider documents that are referenced in the complaint and central to the claims when ruling on a motion to dismiss).

**Limitations Periods.**  Plaintiffs' claims are both subject to a two-year limitations period. *See* Tex. Civ. Prac. & Rem. Code § 16.003(a); *Western Power, Inc. v. TransAmerican Power Prod., Inc.*, 316 F. Supp. 3d 979, 987 (S.D. Tex. 2018).  Plaintiffs had actual knowledge of the elements necessary to bring their claims no later than September 25, 2007, when the Museum reiterated its rejection of Plaintiffs' restitution demand.  The Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524 (the "HEAR Act") *can* displace state limitation periods for art allegedly taken during the Nazi era, affording claimants a six-year statute of limitations.  However, the HEAR Act contains an exception for stale claims that could have been timely brought before the HEAR Act was enacted in 2016.  Because Plaintiffs knew of their claim by September 2007, at the latest, and could have timely filed their claims, the exception applies

and the HEAR Act does not resuscitate Plaintiffs' stale claims.  Plaintiffs' claims are also barred by laches, an equitable defense that is permitted by the HEAR Act.

**Act of State Doctrine.**   The act of state doctrine "limits, for prudential rather than jurisdictional reasons, the adjudication in American courts of the validity of a foreign sovereign's public acts." *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines.*, 965 F.2d 1375, 1387 (5th Cir. 1992).  Claims contravene the doctrine *if* they require "a court of the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Envt'l. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990).  Because the act of state doctrine "is not a jurisdictional limit on the courts," *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) (internal quotation marks omitted), a motion to dismiss based on the act of state doctrine is properly considered under Rule 12(b)(6).

The Museum traces its title to the Painting back to Hugo L. Moser, to whom the Dutch government restituted the work in 1949, as part of its formal, post-war restitution program. Plaintiffs claim the 1949 restitution was invalid, that Moser never acquired good title, and the Museum's possession is therefore unlawful.  For this Court to resolve Plaintiffs' claim, it must analyze the Dutch government's sovereign acts – the validity of that government's formal, post-war, statute-driven restitution process – an analysis that is barred by the act of state doctrine.

<u>**Summary of the Argument**</u>

Plaintiffs' allege the Painting once belonged to their German-born, naturalized Swiss grandfather, Max Emden, who sold it to a buyer for Adolf Hitler in 1938.  Plaintiffs also allege Allied forces discovered the Painting in 1945 and, pursuant to the Allies' external, post-war restitution policies, delivered the Painting to the Dutch government in 1946, which then formally restituted the Painting to Moser in 1949.  Plaintiffs allege Moser sold the Painting to Samuel H.

Kress in 1952 and that the Kress Foundation loaned the Painting to the Museum in 1953, before donating it to the Museum in 1961.  Plaintiffs argue the 1938 sale **and** the 1949 Dutch restitution must be nullified and that the Painting should be restituted to them, as Emden's heirs.

Plaintiffs first advanced the *same* demand for the *same* painting, based on the *same* arguments, on July 7, 2006.  Ex. 1, July 7, 2006 Letter from Edward E. Klein ("2006 Demand"). The Museum investigated the 2006 Demand, examining the circumstances of the 1938 sale and the Painting's provenance.  On January 17, 2007, after much consideration, the Museum rejected Plaintiffs' restitution demand.  The Museum provided Plaintiffs with a copy of its expert's report, which detailed the provenance research.  Plaintiffs responded on September 6, 2007, with an eight-page letter, providing further allegations and documents and restating their demand for restitution. The Museum reaffirmed its rejection of Plaintiffs' demands on September 25, 2007.  Plaintiffs did not file suit.

By September 25, 2007, at the latest, the Plaintiffs knew the following: (1) the Painting's possible connection to Emden; (2) Emden may have sold the Painting to a buyer for Hitler in 1938; (3) the Painting may have been handed over to Moser, as part of the Dutch government's post-war restitutions process, before it came into the Museum's possession; and (4) the Museum had twice rejected their demand for restitution.  Plaintiffs had actual knowledge of the factual basis for their claim against the Museum that was sufficient to trigger the two-year limitations period governing Plaintiffs' causes of action.  That limitations period, which is not extended by the HEAR Act, expired over twelve years ago.  The claims are time barred and the Complaint must be dismissed.

The Complaint must also be dismissed because the claims would require the Court to "declare invalid the official act of a foreign sovereign performed within its own territory," namely the Dutch government's formal restitution of the Painting to Moser in 1949, pursuant to its post-

4

war internal restitution procedures.  *W.S. Kirkpatrick & Co., Inc.,* 493 U.S. at 405; *see also Walter Fuller Aircraft Sales, Inc.*, 965 F.2d at 1387.  Such an action is barred by the act of state doctrine. *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 946 (5th Cir. 2011) (dismissal appropriate if complaint requires "the court to sit in judgment on the decisions and agreements reached by the foreign sovereigns […] an inquiry squarely barred by the act of state doctrine.")

There are no plausible amendments that could make the claims timely or avoid the preclusive effect of the act of state doctrine.  The Complaint should thus be dismissed prejudice.

## Factual Background

### A.  Max Emden's Sale of the Painting

In late 1937, Emden began marketing three Bellotto paintings from his art collection, held at his private island villa in Brissago, Switzerland.  Ex. 2, Bellotto Provenance Research Report by L. Stein Provenance Research, LLC, dated January 18, 2007 ("2007 Provenance Report") at 1, referenced in Plaintiffs' Complaint ("Compl.") at ¶ 52.  Plaintiffs allege the Painting was one of the three Bellotto paintings being marketed.  Compl. ¶ 23.  Anni Caspari, an art dealer chosen by Emden, showed the three Bellotto paintings to Karl Haberstock, who purchased works for Adolf Hitler.  Compl. ¶ 23*;* Ex. 2, 2007 Research Report at 1. Over a period of seven-to-eight months, Caspari brokered a deal with Haberstock.  Compl. ¶ 26. During this time, the three paintings were flown from Switzerland to Berlin – via London – for inspection by Haberstock. Ex. 2, 2007 Provenance Report at 1-2.  As negotiations dragged, Emden recalled the works so they could be shown to other potential buyers in England and Switzerland.  *Id.*  In June 1938, the works were flown again to Berlin for final purchase by Haberstock at the agreed price of SF 60,000. *Id.* Records show that payment was made to Emden, in Swiss francs, in Switzerland.  *Id.* at 2.

5

## B.      Post-War Restitution of the Painting

Plaintiffs allege that Allied forces found the three Bellotto paintings in a salt mine in Austria.  Compl. ¶ 33.  The Allies' policy was to catalogue all found artworks, like the Bellotto paintings, and send them to collecting points such as the Central Collecting Point in Munich (the "MCCP").  Compl. ¶¶ 31-34.  From there, and pursuant to external restitution policies, recovered works were sent to the country where they had likely been taken by the Nazis.  Compl. ¶ 36 n.7. In our case, and in response to a formal notice from the Dutch government, the Allies sent the Painting to the Netherlands in 1946.  Compl.  ¶¶ 35-36.

In 1948, Moser, who fled Germany in 1933 and later fled the Netherlands in 1940, made a claim for a Bellotto painting called *Marketplace at Pirna*, that he purportedly left in Amsterdam when he fled.  Compl, ¶ 29, 37.  Pursuant to its own internal restitution policies and based on Moser's formal claim, the Dutch government restituted the Painting to Moser in 1949.  Compl. ¶ 39.  Moser, who was living in New York, sold the Painting to Samuel H. Kress in 1953.  *Id.* ¶ 40. The Kress Foundation donated the Painting to the Museum in 1961.  *Id.* ¶ 42.

Emden died in in Switzerland in 1940.  Ex. 2, 2007 Research Report, at 2.  His heirs did not file a post-war claim for the Painting or the other two Bellotto paintings sold to Haberstock. *Id.*; Compl. ¶ 36 n.8.  Emden's heirs, however, did make claims after the war to recover property that had been located in Germany, including the Hamburg Polo Club and commercial property inside Germany and occupied territories.  Ex. 2, 2007 Provenance Report at 2.

## C.      Plaintiffs' 2006 Claim for the Painting

In 2006, a lawyer representing the Plaintiffs wrote to the Museum claiming that the Painting once belonged to the Plaintiffs' grandfather, Max Emden, before it was "aryanized during World War II by Nazi art dealer Karl Haberstock."  Ex. 1, 2006 Demand, at 1, which is central to

the allegations in ¶¶ 53, 62, 63, 70, and 76 of the Complaint.  Counsel provided a number of documents to support the claim and looked "forward to discussing restitution of this painting to the Emden family."  *Id*.  To investigate the Plaintiffs' claim and the circumstances of the 1938 sale, the Museum retained provenance research expert Laurie Stein.  Ex. 2, 2007 Provenance Report at 1; Compl. ¶ 52.[1]   The research showed that Emden emigrated to Switzerland in the 1920s, became a naturalized Swiss citizen, was selling artworks located in Switzerland through a Jewish art dealer that he chose, had sufficient autonomy to recall the paintings from Berlin mid-negotiation to show to other potential buyers, and actually received the agreed upon sale proceeds in Switzerland.  Based on this research, the Museum rejected Plaintiffs' contention the 1938 sale was non-voluntary and denied the claim.  Ex. 3, January 18, 2007 letter from Thaddeus J. Stauber, Esq. ("January 2007 Rejection"), which is central to the allegations in ¶¶ 53, 62, 63, 70, and 76 of the Complaint.  The Museum included a copy of the 2007 Provenance Report with its January 2007 Rejection.  *Id.*

Eight months later, the Emdens' attorney responded with a detailed letter providing various factual arguments and exhibits to support the heirs' claim.  Ex. 5, September 6, 2007 letter from Klein ("2007 Demand"), which is central to the allegations in ¶¶ 53, 62, 63, 70, and 76 of the Complaint.  Among other statements, Counsel asserted:

- "[T]here can be no doubt that the Houston MFA Bellotto and the Emden Bellotto are one and the same";

- "[T]he Emden painting was erroneously restituted to Moser [and] Moser's sale to the Kress Collection and their subsequent donation to the Houston MFA is therefore invalid"; and

- "The painting should be restituted to the Emden heirs."

---

[1] Plaintiffs acknowledge that the 2007 Provenance Report, which they continue to dispute, was the Museum's basis for denying their claim.  Compl. ¶ 52.

Ex. 5, 2007 Demand, at 5, 8.

After considering the 2007 Demand and reviewing the 2007 Provenance Report and 2006 Demand, the Museum reaffirmed its rejection of the demand for the Painting.  Ex. 5, September 25, 2007 letter from Stauber ("September 2007 Rejection"), which is central to the allegations in ¶¶ 53, 62, 63, 70, and 76 of the Complaint.

Plaintiffs allege that fourteen years later, in July 2021, they received additional evidence that the Painting belonged to Emden.  Compl. ¶¶ 5, 47, 57.

## Legal Standard

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is a valid means to raise a statute of limitations defense.  *Bush v. United States,* 823 F.2d 909, 910 (5th Cir. 1987).  When considering a 12(b)(6) motion to dismiss, "the Court assumes Plaintiffs' facts to be true."  *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 692 (S.D. Tex. 2015).  Dismissal based on the statute of limitations is warranted if that bar to relief appears on the face of the complaint or other appropriately considered materials.  *Garrett v. Commonwealth Mortg. Corp. of Am.,* 938 F.2d 591, 594 (5th Cir. 1991).  Appropriate materials include documents central to a plaintiff's claims that are referenced in the complaint.  *Collins*, 224 F.3d at 498-99; *see also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 815 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019) (by including such referenced documents the "defendant simply provides additional notice of the basis of the suit to the plaintiff and aids the Court in determining whether a claim has been stated").

In their Complaint, Plaintiffs referenced the 2007 Provenance Report to support their claim that the Museum wrongly denied restitution and the claims for conversion and TTLA are based on

the Museum's refusal to restitute the Painting.[2]  *See,* Compl., ¶¶ 52, 65, 73.  Plaintiffs also referenced the parties' 2006 and 2007 communications to support their claim for conversion.  *Id.* ¶ 68 (alleging the Museum "has not observed reasonable commercial standards of fair dealing [and] has not made reasonable investigatory efforts to confirm the transfer of title from the Netherlands to Moser to the Kress Foundation and ultimately to [the Museum.]")  The written demands and rejections from 2006 and 2007 are central to Plaintiffs' claims, are expressly or implicitly referenced in the Complaint, and should be considered as part of the Motion.  *See e.g., In re TXNB Internal Case,* 483 F.3d 292, 307 (5th Cir. 2007) (finding that "conversion generally takes place only after refusal of a demand for return of the property[.]")

The equitable defense of laches can also be raised through a motion to dismiss.  *See Herron v. Herron,* 255 F.2d 589, 593 (5th Cir. 1958) ("There is general agreement also, under [Federal Rule of Procedure] 9(f), that even the defenses of limitations or laches may be asserted by motion to dismiss for failure to state a claim— provided that the complaint shows affirmatively that the claim is barred.").  For the reasons stated above, the communications from 2006 and 2007 show that Plaintiffs had actual knowledge of their claims but did not file suit for over fourteen years.  That delay is unreasonable.  In addition, no Emden heir made any claim to recover the Painting in the post-war period – or at any other time – until 2006.  Over the course of those many

---

[2] Although Plaintiffs reference the Washington Principles in support of their allegations (Compl. ¶ 53, n.10), those non-binding principles did not create a cause of action, nor did related federal legislation that was enacted to "ensure that laws governing claims to Nazi-confiscated art and other property further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art[.]"  *See,* e.g., Holocaust Victims Redress Act, Pub.L. No. 105-158, 112 Stat. 611 (1998); *Dunbar v. Seger-Thomschitz,* 615 F.3d 574, 577 (5th Cir. 2010) ("no Act of Congress has articulated 'rights and obligations of the United States' in regard to these [restitution] claims, even the HVRA creates no individual cause of action");  *Dunbar v. Seger-Thomschitz,* 638 F.Supp.2d 659, 664 (E.D. La.2009) ("the Holocaust Victim's Redress Act was not intended to give individuals a private cause of action.")

decades, persons with first-hand knowledge died and records and documents that could rebut Plaintiffs' modern-day claims were lost or destroyed. The Museum has been prejudiced by the unreasonable delay in bringing this suit.

A Rule 12(b)(6) motion is also the proper vehicle for raising an act of state doctrine defense. *See Spectrum Stores*, 632 F.3d at 945-46. The Complaint includes facts confirming the Dutch government restituted the Painting to Moser as part of its internal restitution process. The applicable restitution laws of the Netherlands, copies of which are provided herewith, provide further support of this defense and should be considered. *See Riviana Foods, Inc. v. Golden Star Trading, Inc.*, No. 4:19-CV-01994, 2020 WL 6153602, at *3 (S.D. Tex. Apr. 6, 2020) ("Under Federal Rule of Civil Procedure 44.1, courts may take judicial notice of the laws of foreign countries if a party gives notice in a pleading or other writing that they intend to raise an issue of foreign law."). Accordingly, pursuant to Rule 44.1, the Museum hereby gives notice it intends to raise an issue of foreign law of the Kingdom of the Netherlands, specifically Royal Decree E100 and E133.

## Argument

### A.    Plaintiffs' Claims Are Barred by the Applicable Limitation Periods

In Texas, the statute of limitations for a claim of conversion is two years. *See* Tex. Civ. Prac. & Rem. Code § 16.003(a). TTLA claims are also subject to a two-year limitations period. *Id.*; *see also W. Power, Inc. v. TransAmerican Power Prod., Inc.*, 316 F. Supp. 3d 979, 987 (S.D. Tex. 2018). "Under Texas law, knowledge of facts that would lead a reasonable person to undertake further inquiry is sufficient to begin the limitations period." *Matter of Placid Oil Co.*, 932 F.2d 394, 399 (5th Cir. 1991). For conversion claims, specifically, accrual generally occurs at the time of the unlawful taking *or* when "the return of the property has been demanded and

refused [or] the person in possession has unequivocally exercised acts of domination over the property inconsistent with the claims of the owner or the person entitled to possession." *Id.*

Documented communications confirm that Plaintiffs had *actual* knowledge of their claims, which they first raised in the 2006 Demand and again in the more detailed 2007 Demand, stating unequivocally "there can be no doubt that the Houston MFA Bellotto and the Emden Bellotto are one and the same." 2007 Demand, at 5. The conversion and TTLA claims thus accrued on September 25, 2007, at the latest, when the Museum reaffirmed its denial of Plaintiffs' demand that "[t]he painting should be restituted to the Emden heirs." 2007 Demand, at 8. Plaintiffs' actual knowledge was sufficient to trigger the applicable limitations periods. *See e.g.*, *Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 100 (Tex. 1994) (recognizing that a "cause of action generally accrues at the time when facts come into existence that authorize a claimant to seek a judicial remedy"). The applicable two-year limitations period thus expired no later than September 25, 2009, and the claims are time barred. *Hoffart v. Wiggins,* 1:08-CV-46, 2010 U.S. Dist. LEXIS 29010, *42 (E.D. Tex. Jan. 30, 2010) (Hines, Mag. J.), *rejected in part on other grounds*, 2010 U.S. Dist. LEXIS 19504, *13, *rev'd on other grounds, 406 Fed. Appx. 834* (5th Cir. 2010) (holding that the plaintiffs' claims were barred because they "became aware of their injury" after receiving a letter related to them more than two years before filing suit).

Plaintiffs seem to argue that despite their demands in 2006 and 2007, the limitations period did not start until July 2021 because the German Art Commission issued a finding in March 2019 concerning the other works Emden sold to Haberstock and because the Monuments Men Foundation for Preservation of Art found *additional* evidence linking the Painting to Max Emden. Compl. ¶¶ 44-48, 57. Even if Plaintiffs were provided with this additional information recently, that has no bearing on what Plaintiffs admittedly knew in 2006 and 2007 and does not restart (or

11

toll) the limitations period.  *See, e.g., Matter of Placid Oil Co.*, 932 F.2d at 395-396, 399 (limitations period was triggered in 1983 when claimant knew Placid Oil had its data and through reasonable diligence *could have* determined its possession was wrongful; by 1986, when claimants allegedly "first discovered" that Placid Oil *wrongfully* had obtained its data, the limitations period was already triggered and had expired.)

### 1.    The Limitation Periods Were Not Tolled

Although Texas recognizes two doctrines that may extend the statute of limitations, *see Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011), neither of them applies here because Plaintiffs had actual knowledge of their claims more than two years before they filed suit.  *See Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 209 (Tex. 2011) ("Irrespective of the potential effect of fraudulent concealment or the discovery rule on limitations, actual knowledge of alleged injury-causing conduct starts the clock on the limitations period"); *Shell Oil Co.,* 356 S.W.3d at 928-30 (finding that fraudulent concealment does not apply if plaintiff *could have* discovered harmful conduct through reasonable diligence; discovery rule does not apply *unless* injury is "inherently undiscoverable").  Furthermore, unlike the discovery rule, fraudulent concealment is an affirmative defense to the statute of limitations that must be pleaded and proved by the plaintiff.  *Matter of Placid Oil Co.*, 932 F.2d at 399 (*citing Weaver v. Witt*, 561 S.W.2d 792, 793 (Tex. 1977) (per curiam)).  The Plaintiffs have not asserted that they are entitled to a tolling of the limitations period based on fraudulent concealment and, therefore, they cannot rely on it to toll the limitations period.  As discussed above, Plaintiffs had actual knowledge of their claims and the Museum's rejection by September 25, 2007.

12

## 2.      The HEAR Act Does Not Salvage Plaintiffs' Untimely Claims

Plaintiffs contend that their claims are rendered timely by the HEAR Act.  Compl., ¶¶ 55-56.  Plaintiffs, however, ignore the exception in Section 5(e), which precludes stale claims.  The plain language of the exception and language from the Senate Report that accompanied the HEAR Act confirm that Plaintiffs' claims are time barred.  Section 5(e) states:

> EXCEPTION. — Subsection (a) shall not apply to any civil claim or cause of action barred on the day before the date of enactment of this Act by a Federal or State statute of limitations if —
>
> (1) the claimant or a predecessor-in-interest of the claimant had knowledge of the elements set forth in subsection (a) on or after January 1, 1999; and
>
> (2) not less than 6 years have passed from the date such claimant or predecessor-in-interest acquired such knowledge and during which time the civil claim or cause of action was not barred by a Federal or State statute of limitations.

HEAR Act Section 5(e).  Plaintiffs' 2007 Demand demonstrates that they "had knowledge of the elements set forth in subsection (a)[3] on or after January 1, 1999," namely, Plaintiffs had knowledge of "(1) the identity and location of the artwork or other property [e.g., 'there can be no doubt that the Houston MFA Bellotto and the Emden Bellotto are one and the same']; and (2) a possessory interest of the claimant in the artwork or other property [e.g., 'Moser's sale to the Kress Collection and their subsequent donation to the Houston MFA is therefore invalid.  The painting should be restituted to the Emden heirs.']"  2007 Rejection, at 5, 8.  That satisfies the first clause of 5(e).

---

[3] Section 5(a) of the HEAR Act reads:

> IN GENERAL.—Notwithstanding any other provision of Federal or State law or any defense at law relating to the passage of time, and except as otherwise provided in this section, a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant or the agent of the claimant of—
>
> (1) the identity and location of the artwork or other property; and
> (2) a possessory interest of the claimant in the artwork or other property.

4877-2387-9686.1

The second clause is also satisfied, as more than six years passed since Plaintiffs acquired the requisite knowledge – in September 2007 – and at some time during those six years, the claims were not time barred by the applicable two-year statute of limitations. The HEAR Act's stale claims exception does not require that the claims be timely for the entire six-year period, but only that during that six years of knowledge and inaction the claimant had adequate time – two years in this case – to file their claims.  As explained in the Senate Report's Section-By-Section Summary of Bill 2763:

> Subsection (e) states that claims do not benefit from the HEAR Act limitations period if the claimant had the relevant actual knowledge on or after January 1, 1999, not less than six years have passed from the date the claimant (or the claimant's predecessor in interest) had such knowledge, *during any portion of that time the claim was timely* and, nonetheless, the claimant failed to bring it . . .

> The six year period in subsection 5(e) . . . is not intended to extend shorter limitations periods that came and went prior to the enactment of the HEAR Act.  For instance, if the relevant conditions are met and the claim arose after 1999; the applicable statute of limitations was three years; and three years lapsed before the HEAR Act was enacted, the claim would fall under the 5(e) exception.  The claimant must have had, however, an opportunity to bring a claim that was not time-barred during that six year period.

S. Rep. No. 114-394, at 10-11 (2016)  (https://www.congress.gov/114/crpt/srpt394/CRPT-114srpt394.pdf).  The plain language of the exception *and* the Senate Report make clear that if the claim could have been timely brought prior to the 2016 enactment, but the claimant failed to file suit, the HEAR Act does not displace the pre-existing statute of limitations.

In our case, the HEAR Act's stale claims exception applies and Plaintiffs' claims are barred because (1) Plaintiffs had the requisite knowledge of their claim on or after January 1, 1999, (2) more than six years have passed since they obtained the requisite knowledge (i.e., 2007), (3)

Plaintiffs' claim was not time barred from 2007 to 2009 (Texas' two-year limitations period), and (4) Plaintiffs did not file suit until 2021.[4]

## B.   Plaintiffs' Decades-Old Claims Are Barred by Laches

Laches consists of two elements: (1) unreasonable delay by one having legal or equitable rights in asserting them and (2) good faith change of position by another to his detriment because of the delay. *City of Fort Worth v. Johnson,* 388 S.W.2d 400, 403 (Tex.1964).[5]  "Laches embraces not only the element of time but the added ingredient of prejudicial harm." *Westworth Vill. v. Mitchell*, 414 S.W.2d 59, 61 (Tex. Civ. App. 1967), *writ refused n.r.e.* (July 26, 1967).  If the delay impairs the defendant's ability to defend against the claim or to ascertain the true facts, then plaintiff's claim should be barred. *Pearson v. American Fidelity & Casualty Co.,* 321 S.W.2d 620, 622 (Tex. Civ. App.-Amarillo 1959, *writ ref'd n.r.e.*) ("no question in this case that the delay in appellee bringing the suit as late as it did that appellant was injuriously affected because of the

---

[4]  Notwithstanding the applicability of Section 5(e), Plaintiffs contend that Section 5(b) renders their claims timely.  Compl. ¶ 56.  That section can afford different treatment "where works of art are produced in multiples, such as a print of which several virtually-identical copies are made."  S. Rep. No. 114-394, at 9-10 (2016) (discussing Section 5(b)).  If the "claimant sees an identical print to one that was expropriated by the Nazis," the start of the six-year limitation period is tolled until the "claimant has sufficient knowledge that the particular version of the artworks is the one that was taken."  *Id.*

This section does not apply for two reasons.  First, because Section 5(e) applies, Plaintiffs' claims are subject to the Texas limitations periods, which expired in 2009, and not the HEAR Act's six-year limitations period, ending the analysis.  Second, there was no misidentification because Plaintiffs had actual knowledge – articulated in their demands – that the painting in the Museum is the artwork that is alleged to have belonged to Max Emden.  Plaintiffs *did* identify the Painting, and the provision for "possible misidentification" thus does not apply.

[55] *Laches* remains a viable defense despite enactment of the HEAR Act, as the legislative history confirms the continued "availability of equitable defenses and the doctrine of laches."  Senate Report 114-394, December 6, 2016, at 7; *see also Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 196-97 (2d Cir. 2019), *cert denied*, 140 S. Ct 1269 (2020) ("While the HEAR Act revives claims that would otherwise be untimely under state-based statutes of limitations, it allows defendants to assert equitable defenses like laches [and] the legislative history of the HEAR Act makes clear that Congress intended that laches remains a viable defense to otherwise covered claims.").

death of witnesses by whom the truth of the situation could be proven"); *Fazakerly v. Fazakerly*, 996 S.W.2d 260, 265 (Tex. App.–Eastland 1999, pet. denied) (finding laches barred claim where key witness had become incompetent to testify due to Alzheimer's disease); *De Benavides v. Warren*, 674 S.W.2d 353, 362 (Tex. App. 1984), *writ refused n.r.e.* (Oct. 10, 1984) (finding laches barred claim where seven-year delay made it more difficult to retrieve evidence.)

In this case, Hans Heinrich Emden, Emden's son and sole immediate heir, Compl. at ¶¶ 8-10, made no post-war claim to recover the Painting, even though other post-war claims were made to recover assets (located in Germany) taken during the war.  Ex. 2, 2007 Provenance Report, at 2.  Hans Heinrich Emden would have possessed relevant knowledge and information about the circumstances of his father's sale of the Painting to Haberstock in 1938, including his motivations and whether the sale was voluntary, as the Museum's research found.  *Id.*, at 1-2.

Yet, it was not until 2021, 83 years after Emden sold the Painting, and 60 years after the Museum acquired the Painting, that Hans Heinrich Emden's sons filed suit.  In that time, records have been lost and witnesses with relevant information have died, including Plaintiffs' father. Compl. ¶¶ 8-10; Ex. 4, 2007 Demand; Ex. 2, 2007 Provenance Report at 1-2.  The Museum is now prejudiced in its ability to defend the Plaintiffs' claim that the 1938 sale was involuntary.  *See*, *Pearson,* 321 S.W.2d at 622.

Although application of laches can be a fact-intensive process, the laches defense may be asserted at the motion to dismiss stage if it "is clear from the face of [the] complaint" that plaintiff's claims are barred.  *See Bernardo Footwear, LLC v. Ashley Nettye, Inc.*, No. H-11-2057, 2012 WL 1076252, at *4 (S.D. Tex. Mar. 28, 2012).  More than eighty years has passed since the alleged taking, during which time key records have been lost or destroyed and persons with first-hand

16

knowledge have passed away, including Emden and his son Hans Heinrich Emden, who took no action to recover the Painting.  Compl. ¶¶ 8-10; Ex. 2, 2007 Provenance Report at 1-2.

Other courts have used laches to bar stale post-World War II restitution claims, recognizing that the question of laches can be resolved as a matter of law.  *See, e.g., Zuckerman*, 928 F.3d at 195 (holding "'the original owner[s'] lack of due diligence and prejudice to the party currently in possession are apparent,' and the issue of laches can be decided as a matter of law") (quotation omitted).  In a case spanning many decades, like this, other courts have found that claimants are bound by their family's knowledge and lack of diligence.  *See, e.g., Bakalar v. Vavra*, 819 F. Supp. 2d 293, 305 (S.D.N.Y. 2011) (granting post-trial motion for a directed verdict, noting the parties' predecessors' lack of diligence), *aff'd*, 500 F. App'x 6 (2d Cir. 2012).

Because Emden's heirs waited many decades to challenge a foreign sovereign's restitution process, such that relevant witnesses are dead and important records have been lost or destroyed, Plaintiffs' delay has unreasonably prejudiced the Museum and its ability to defend itself.  As a result, this Court should find that Plaintiffs' claims are also barred by laches.

**C.    The Act of State Doctrine Bars Plaintiffs' Claims**

Plaintiffs' claims require analysis and nullification of the Dutch government's formal restitution of the Painting to Moser in 1949.  However, the act of state doctrine "limits, for prudential rather than jurisdictional reasons, the adjudication in American courts of the validity of a foreign sovereign's public acts."  *Walter Fuller Aircraft Sales, Inc.*, 965 F.2d at 1387.  Plaintiffs' claims contravene this doctrine because they require "a court of the United States to declare invalid the official act of a foreign sovereign performed within its own territory."  *W.S. Kirkpatrick & Co., Inc.*, 493 U.S. at 405.  As the D.C. Circuit found, the "doctrine 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."  *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154,

17

1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964));

*see also Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).   Moreover, the doctrine

prevents a court in this country "from deciding a case when the outcome turns upon the legality or

illegality (whether as a matter of U.S., foreign, or international law) of official action by a foreign

sovereign performed within its own territory."   *Riggs Nat'l Corp. & Subsidiaries v. Comm'r of

IRS*, 163 F.3d 1363, 1367 (D.C. Cir. 1999); *see also W.S. Kirkpatrick & Co.*, 493 U.S. at 405.

     The doctrine can be a defense to actions against both sovereign defendants and private

parties.   *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1115 (5th Cir. 1985) ("For act of state (as

opposed to sovereign immunity) purposes, the relevant acts are not merely those of the named

defendants, but any governmental acts whose validity would be called into question by

adjudication of the suit.").   When applying the act of state doctrine, the court should not restrict its

analysis to the acts of the named defendants, but look to the relevant actions of a sovereign:

> In the act of state context, even if the defendant is a private party, not an
> instrumentality of a foreign state, and even if the suit is not based specifically on a
> sovereign act, we nevertheless decline to decide the merits of the case if in doing
> so we would need to judge the validity of the public acts of a sovereign performed
> within its own territory.

*Id.* at 1113.   The Court should therefore look beyond the named defendants and consider "any

governmental acts whose validity would be called into question by adjudication of the

suit."   *Walter Fuller Aircraft Sales, Inc.,* 965 F.2d at 1387-88 (citations and quotations omitted.)

     The act of state doctrine has been applied to restitution claims, including claims for works

that had been restituted by the Dutch government.   *Von Saher v. Norton Simon Museum of Art at

Pasadena*, 897 F.3d 1141 (9th Cir.2018) ("*Von Saher II*").[6]   In *Von Saher*, like here, the claimants

---

[6] Although the decisions in *Von Saher I* and *Von Saher II*, from the Ninth Circuit, are not binding on this Court, it is persuasive authority that is analogous and compelling.

sought restitution of paintings owned by a U.S. museum that were allegedly taken by the Nazis and then restituted to a different claimant by the Dutch government following the war.  The Ninth Circuit found the Norton Simon museum had good title because "the act of state doctrine deems valid the Dutch government's conveyance to Stroganoff," who later sold the paintings to the museum.  *Von Saher II*, 897 F.3d at 1143.

Plaintiffs here also seek to nullify the Dutch government's restitution of the Painting to Moser, in 1949, and from there argue that the Museum could not have acquired good title because Moser did not have good title to begin with.  However, as in *Von Saher*, the Painting was transferred to the Netherlands pursuant to the Allies' external restitution policies, Complaint ¶¶ 35-36, where it became Dutch state property subject to restitution claims by Dutch citizens.  *See Von Saher II*, 897 F.3d at 1144.  From there, the Dutch government chose to restitute the Painting to Moser pursuant to its internal restitution policies. Compl. ¶¶ 37, 39.

Although there are exceptions to the act of state doctrine, they do not apply here.  First, as is apparent from both the *Von Saher* decision and the U.S. government's submission in that case, the Dutch government's decision was a sovereign act.  The exception for "purely commercial acts" therefore does not apply.  *See Von Saher II*, 897 F.3d at 1154 (recognizing that "expropriation, claims processing, and government restitution schemes are not the province of private citizens").  Nor does the exception known as the "Second Hickenlooper Amendment," codified at 22 U.S.C. § 2370(e)(2).  That exception applies only where there has been a "confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law[.]" 22 U.S.C. § 2370(e)(2).  Here, the only alleged taking, which was *not by any of the Defendants*, occurred in 1938.  Thus, this exception does not apply either.

Like the claims in *Von Saher*, Plaintiffs' claims here are barred by the act of state doctrine because they challenge an official act by the Dutch government and would require the court to nullify "official acts of the Dutch government – a result the doctrine was designed to avoid."[7] *Von Saher II*, 897 F.3d at 1153 (recognizing that Dutch Minister's binding decision to accept in part and reject in part the Restitution Committee's recommendation regarding an artwork was an "act of the Dutch state" that could not be second-guessed by a U.S. court).  As discussed below and in *Von Saher*, the Netherlands had a *bona fide* and robust restitution process after World War II. Moser participated in that process, as Plaintiffs acknowledge, and the Painting was restituted to him as a result.

1.      **Post-War Restitution Programs of the Allies**[8]

**The Allies' External Restitution Program.**  The Executive Branch's policy of external restitution was expressed in two main sources: The London Declaration of 1943 and "Art Objects in U.S. Zone," a U.S. policy statement approved by President Truman during the Potsdam Conference in August of 1945.  *See*, *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 961 (9th Cir. 2010) ("*Von Saher I*") (discussion of U.S. post-war restitution policies).

**The London Declaration.**  The United States and the Netherlands, along with sixteen other nations, were signatories to the London Declaration of January 5, 1943.  *See*, *Forced Transfers of Property in Enemy-Controlled Territory, 1943*, in 3 Dep't of State, Treaties and Other

---

[7] While the Court of Appeals in *Von Saher* did not rule on this issue, Royal Decrees E100 and E133 – which expropriated enemy property and administered the "system through which Dutch nationals filed claims to restore title to lost or looted artworks" – are additional sovereign acts that this Court would be required to invalidate were it to rule in favor of Plaintiff.  *Von Saher II*, 897 F.3d at 1149.  This provides additional support for application of the act of state doctrine in this case to bar Plaintiffs' claims.

[8] A summary of the relevant post-war restitution programs is useful for analysis of the act of state doctrine in this matter as they demonstrate the policies and laws which resulted in the Dutch government's official restitution action which bars Plaintiffs' modern-day claims.

International Agreements of the United States of America 1776-1949, at 754 (C. Bevans comp. 1969).  The London Declaration served as a "formal warning to all concerned, and in particular persons in neutral countries," that the Allies intended "to do their utmost to defeat the methods of dispossession practiced by the governments with which they [were] at war [.]"  *Id.*  The London Declaration does not explicitly address restitution or reparations, but has been credited by some with laying the foundation for the United States' postwar restitution policy.  *See, e.g., Presidential Advisory Commission on Holocaust Assets in the United States, Plunder and Restitution: The U.S. and Holocaust Victims' Assets*, at SR-139 (Dec. 2000) ("*Plunder and Restitution*").

**Art Objects in U.S. Zones**.  When the American forces entered Germany in the winter of 1944–45, they discovered large stashes of Nazi-looted art.  *Plunder and Restitution* at SR-13, SR-85.  U.S. authorities established several central collection points within the U.S. Zone to assemble the recovered artwork "for proper care and study."  *Report, Art Objects in U.S. Zone*, July 29, 1945, USGCC HQ ("*Art Objects in U.S. Zone*").  At the Potsdam Conference, held on July 29, 1945, President Truman approved a policy statement setting forth the standard operating procedures governing the looted artwork found within the U.S. zone of occupation.  *See, Art Objects in U.S. Zone;* and *American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas*, Report, 148 (1946); *see also* Compl. ¶ 36, n.7.

The governments of the formerly occupied countries – including the Netherlands – submitted consolidated lists of items taken by the Germans, with information about the location and circumstances of the theft.  *Plunder and Restitution* at SR-142.  The U.S. authorities examined the lists, and when artwork was identified, it was returned to the country of origin.  *Id.*  Under this policy of "external restitution," the U.S. restituted the looted artwork to countries, not individuals.  *Art Objects in U.S. Zone*; *Plunder and Restitution* at SR-139-145; see, *Von Saher I*, 592 F.3d at

962-963 (discussing the State Department's reasons for favoring a policy of restitution to governments, rather than restitution to individuals.) And, once "the art was returned to the country of origin, the U.S. played no further role." *Von Saher I*, at 962.

**Allied Forces Deliver the Painting to the Netherlands.**  According to the Complaint, Allied forces discovered the Painting in Austria in March 1945 and sent it the MCCP, where it was catalogued and numbered.  Compl. ¶¶ 33-34.  In March 1946, Dutch officials formally notified Allied forces at the MCCP that they were looking for a Bellotto painting, called *Marketplace at Pirna*, that a Dutch entity, the Goudstikker Gallery, had sold to Maria Almas-Dietrich who was an art dealer that dealt directly with Hitler.  Compl. ¶¶ 30, 35.  In April 1946, pursuant to the external restitution policies and believing the Painting was the work sought by the Dutch officials, Allied forces sent the Painting to the Netherlands.  Compl. ¶ 36.

In May 1948, Moser wrote to officials at the Netherlands Art Property Foundation stating that he had purchased a Bellotto painting called *Marketplace at Pirna* in 1928, but left it with an art restorer in Amsterdam when he fled the country in 1940.  Compl. ¶ 37.  Moser further claimed that his brother-in-law sold the painting without his permission to an art dealer who then sold it to the Goudstikker Gallery.  *Id.*  In or just before May 1949, the Dutch government restituted the Painting to Moser.  *Id.* ¶¶ 2, 39.

### 2.   The Dutch Post-War Restitution Program

The Dutch government created a comprehensive restitution program providing two different forms of relief: (1) restitution, which invalidated wartime transactions and returned property or compensation to former owners, and (2) reparations, whereby Germany compensated the Dutch State for the damage inflicted on it.  The program centered on two Royal Decrees: E100 and E133.  *See* Ex. 6, Royal Decree E100, and Ex. 7, Royal Decree E133; *see also Von Saher II*, 897 F.3d at 1144-45 (detailed discussion of both decrees).

22

Royal Decree E100, enacted in 1944, established a Council for the Restoration of Rights (the "Council") with broad and exclusive powers to review all wartime transactions and to order restitution.  Ex. 6, *e.g.*, at Art. 1-5.  Under E100, the Council had the power to declare totally or partially null and void or to modify "any legal relations that originated or were modified during enemy occupation of the [Netherlands]" and could do so where the transaction was the result of coercion or improper influence by the enemy.  Ex. 6, at Arts. 23-25; *Von Saher II*, 897 F.3d at 1144.  The Council also had the power to order the return of property to its former owner, subject to appropriate conditions, or to order compensation.  Ex. 6, at Arts. 26, 27, and 34.  E100 was the exclusive mechanism for claimants seeking restitution of property lost as a result of wartime transactions.  *Id.*, at Art. 19.

Royal Decree E133 was enacted in 1944 to "expropriate enemy assets in order to compensate the Netherlands for losses it suffered during World War II."  *Von Saher II*, at 1145. Article 3 of E133 provided that, within the Netherlands, all "[p]roperty, belonging to an enemy state or to an enemy national, automatically passes in ownership to the State with the entering into force of this decree[.]" Ex. 7, at Art. 3.  The expropriation was automatic.  *Id.*

In sum, recuperated enemy property passed into the Netherlands' ownership under Decree E133, subject to the right, under E100, of a former Dutch owner to request nullification of the transaction with the enemy and restitution of the asset.  Decree E100 and Decree E133 worked together to ensure the orderly disposition of restituted property.

### 3. Plaintiffs' Claims Would Require This Court to Analyze the Dutch Government's Restitution in Contravention of Act of State Doctrine

In accordance with the Dutch laws and policies listed above, the Netherlands formally and officially restituted the Painting to Moser in 1949.  Moser could not have recovered the Painting but through the formal restitution process, which he followed by submitting a written claim to

23

officials at the Netherlands Art Property Foundation.   Compl.   ¶ 37.   Plaintiffs confirm that

restitution of the Painting to Moser was performed by the Dutch government.   *Id.* ¶ 39.

The Dutch government's determination to transfer the Painting to Moser amounts to a

binding act of the sovereign within its own territory that this Court would need to invalidate to

grant Plaintiffs the relief they seek.   The act of state doctrine, therefore, applies.   *Von Saher II*, 897

F.3d at 1152-53.   Dismissal of this case is consistent with the United States' policies underlying

the act of state doctrine.   *See id.* at 1156.   In *Von Saher*, the Ninth Circuit explained that "[o]ur

judiciary created the act of state doctrine for cases like this one. In applying it, we presume the

validity of the Dutch government's sensitive policy judgments and avoid embroiling our domestic

courts in re-litigating long-resolved matters entangled with foreign affairs." *Id.*   The U.S. policies

implicated in *Von Saher* apply equally here.   As the Solicitor General explained in an *Amicus* brief

submitted to the Supreme Court in 2011:

> Notably, moreover, this case concerns artworks and transactions that, consistent
> with U.S. policies, have already been the subject of both external and internal
> restitution proceedings, including recent proceedings by the Netherlands in
> response to the Washington Principles.  This case does not involve artwork whose
> existence or provenance has only recently been discovered and has never been the
> subject of restitution proceedings.  The [artworks] were transferred by the United
> States to the Netherlands in 1946 pursuant to the policy of external restitution.  One
> of the purposes of that policy at the time was to prevent the United States from
> becoming entangled in difficult ownership questions regarding confiscated
> property.  That policy judgment demonstrates that, from the perspective of the
> United States, it was the particular nation concerned (here, the Netherlands) that
> was to have the immediate responsibility for determining issues of ownership and
> restitution of, or restoration of rights in, works like the [artworks] […]
>
> The United States has a continuing interest in that finality when appropriate actions
> have been taken by a foreign government concerning the internal restitution of art
> that was externally restituted by the United States following World War II. […]
>
> *When a foreign nation, like the Netherlands here, has conducted bona fide post-*
> *war internal restitution proceedings following the return of Nazi-confiscated art to*
> *that nation under the external restitution policy, the United States has a substantial*
> *interest in respecting the outcome of that nation's proceedings*.

Ex. 8, Brief for the United States as *Amicus Curiae* in *Von Saher v. Norton Simon Museum of Art at Pasadena* (No. 09-1254) (2011) at 16-19 (emphasis added) (citations omitted).  The Solicitor General went on to specify that the "act of state doctrine and considerations of international comity . . . also weigh in favor of giving effect to the Dutch government's actions in this case."  *Id.* at 20. Just as in *Von Saher*, it is apparent that application of the act of state doctrine in this case is consistent with the policies underlying that doctrine and U.S. policy. Because the Dutch government's formal restitution of the Painting to Moser, in 1949, was a sovereign act of the Dutch state – and no exception applies – Plaintiffs' claims are barred by the act of state doctrine.

## Conclusion

The Complaint should be dismissed because it is clear from its face and the referenced documents that Plaintiffs' claims are untimely and barred by the applicable statute of limitations. The claims are also barred by laches, because Plaintiffs' delay in advancing their claims was both unreasonable and prejudicial to the Museum.  The act of state doctrine also bars the claims because, for Plaintiffs to prevail, the Court would have to nullify official acts of the Dutch government.  The Museum respectfully requests that the Complaint be dismissed with prejudice.

Dated: December 17, 2021

By:      */s/Richard A. Schwartz*
        Richard A. Schwartz
        Elizabeth F. Eoff
        MUNSCH HARDT KOPF & HARR, P.C.
        700 Milam Street, Suite 2700 / Houston,
        Texas 77002-2806
        dschwartz@munsch.com
        eeoff@munsch.com

        -  and  -

        Thaddeus J. Stauber (*pro hac vice*)
        Aaron M. Brian (*pro hac vice*)
        NIXON PEABODY LLP
        300 South Grand Avenue, Suite 4100
        Los Angeles, CA 90071-3151

Tel: (213) 629-6000
tstauber@nixonpeabody.com
abrian@nixonpeabody.com

*Attorneys for Defendant*
*Museum of Fine Arts, Houston*

26

## CERTIFICATE OF SERVICE

I certify that on December 17, 2021, a true and correct copy of the foregoing Motion to Dismiss was served using the CM/ECF system which will send notification of such filing to all counsel of record who have registered as filing users of the system as follows:

William S. Richmond
brichmond@pcrfirm.com
Hillary Kramer Lynch
hlynch@pcrfirm.com
Nicholas C. Kliewer
nkliewer@pcrfirm.com
PLATT CHEEMA RICHMOND PLLC
1201 N. Riverfront Blvd., Suite 150
Dallas, Texas 75207
214.559.2700 Main
214.559.4390 Fax
COUNSEL FOR PLAINTIFFS

/s/ Richard A. Schwartz
Richard A. Schwartz