Case 4:21-cv-03348   Document 38   Filed on 05/02/22 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
May 02, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **JUAN CARLOS EMDEN** *et al*, | § § § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. 4:21-CV-3348 |
| **THE MUSEUM OF FINE ARTS, HOUSTON** | § § § § | |
| Defendant. | § | |

**MEMORANDUM & ORDER**

The Court held a hearing on Defendant's Motion to Dismiss (doc. 13) on March 24, 2022. At that hearing, the Court took the Motion under advisement. The Court now **GRANTS** Defendant's Motion to Dismiss without prejudice and provides this Memorandum & Order to document its rulings and reasoning.

**I.    FACTUAL BACKGROUND[1]**

This controversy centers around two paintings. The first is "The Marketplace at Pirna" by Bernardo Bellotto, currently owned by the Houston Museum of Fine Arts (MFA). The second is "After Bellotto" painted by an unknown Bellotto imitator. The second is relevant only because plaintiffs claim that it caused confusion that renders invalid the MFA's title to "The Marketplace at Pirna." Two other Bellotto paintings once owned by plaintiffs' relative, Dr. Max Emden, are mentioned briefly to provide context, but those two Bellottos are not at issue here.

---

[1] These facts are taken from the plaintiffs' Complaint and reflect plaintiffs' view of the matter, as is appropriate at the motion to dismiss stage.

1

### A.  "The Marketplace at Pirna"

In 1753, Bernardo Bellotto painted "The Marketplace at Pirna" as a royal commission for Augustus III who was the king of Poland and the elector of Saxony. (Doc. 1 at ¶15). In the late 1700s, "The Marketplace at Pirna" was acquired by Leipzig art collector Gottfried Winckler, who marked it with inventory number 1025 on its bottom right-hand corner. (Doc. 1 at ¶18). By 1930, Dr. Max Emden, a German Jewish merchant and grandfather to the Emden plaintiff-heirs, owned the painting, along with two other Bellotto paintings. (*Id.*). But on June 30, 1938, Dr. Emden—under Nazi-orchestrated economic duress—sold "The Marketplace at Pirna", as well as his two other Bellotto paintings, to Nazi art dealer Karl Haberstock. (*Id.* at ¶23). The very same day, Haberstock sold all three Bellottos to the Reich Chancellery as they were intended for Hitler's *Führermuseum* in Linz, Austria. (*Id.*). Dr. Emden died two years later in June 1940. (*Id.*).

In May of 1945, "The Marketplace at Pirna" was found by the Monuments Men and Women in an Austrian salt mine. (*Id.* at ¶33). The Monuments Men and Women were a group of mostly American and British museum curators, art historians, librarians, architects, and artists tasked with preserving the artistic and cultural achievements of western civilization from the destruction of war and theft by the Nazis. (*Id.* at ¶31). In June of 1945, "The Marketplace at Pirna" was moved by the Monuments Men and Women to the Munich Central Collecting Point (MCCP) to be held there pending return to its rightful owner. (*Id.* at ¶34).

### B.  "After Bellotto"

In 1928, Hugo Moser, a German art dealer and collector, purchased "After Bellotto", a work by an unknown imitator of Bernardo Bellotto's "The Marketplace at Pirna." (*Id.* at ¶28). Artists of the late 1700s and 1800s regularly copied Bellotto's urban landscape scenes in his style because his original works of art became even more popular and valuable after his death. (*Id.*) In

2

1933, when the Nazis came to power, Moser fled Germany for the Netherlands; and when the Nazi invasion of the Netherlands became imminent, he fled to the United States, leaving his painting in the care of an art restorer in Amsterdam. (*Id*. at ¶29).

Without Moser's permission or knowledge, Moser's brother-in-law then took "After Bellotto" from the art restorer and sold it to a dealer called Douwes Fine Art. (*Id*. at ¶37). And Douwes Fine Art then sold the painting to the Amsterdam-based Goudstikker Gallery where it was purchased by Nazi art dealer Maria Almas-Dietrich. (*Id*. at ¶29-30). Moser was not compensated for any of these sales. (*Id*. at ¶37). At war's end, "After Bellotto" was found in a storage facility containing dozens of other works of art owned by Almas-Dietrich. (*Id*. at ¶30). And in November of 1945, the painting was moved to the MCCP to be held there pending return to its rightful owner, since works owned by Almas-Dietrich were presumed to be stolen. (*Id*. at ¶31).

### C. The Alleged Mix-Up

In March 1946, Dutch officials filed Dutch Declaration Form 7056, alerting the Monuments Men and Women that they sought a Bernardo Bellotto painting called "The Marketplace at Pirna" which the Goudstikker Gallery claimed it had sold to Nazi dealer Maria Almas-Dietrich. (*Id*. at ¶35). The Dutch Declaration Form complied with the requirements of the Netherlands Art Property Foundation (Dutch: Stichting Nederlands Kunstbezit or "SNK"), the Dutch government agency that dealt with post-WWII restitution. (*Id*.) However, plaintiffs claim that the Dutch government's Declaration Form contained a clerical error, because the Goudstikker Gallery had never owned "The Marketplace at Pirna" by Bellotto; instead, the Goudstikker had allegedly owned the near-identical "After Bellotto"—rendered by an unknown artist *in the style* of Bellotto. (*Id*.) Nevertheless, in April 1946, pursuant to external restitution policies and Dutch

3

Declaration Form 7056, the Monuments Men and Women sent Bellotto's "The Marketplace at Pirna" to the Netherlands. (*Id.* at ¶35).

In May of 1948, German art dealer Hugo Moser wrote to the Dutch officials stating that he was the true owner of "After Bellotto" (by an unknown artist in the style of Bellotto), which he had purchased in 1928 then left in Amsterdam when he fled Nazi occupation in 1940. (*Id.* at ¶37). The Dutch government then allegedly compounded its initial mistake by restituting "The Marketplace at Pirna"—instead of "After Bellotto"—to Hugo Moser. (*Id.* at ¶39).

In 1949, the Monuments Men discovered that they may have mistakenly given over "The Marketplace at Pirna" to the Dutch government. (*Id.*). Therefore, they wrote a letter ("The Munsing Letter") to Dutch officials suggesting that their conveyance to the Dutch had been in error. (*Id.*) However, the Dutch government declined to return the painting as they had already restituted it to Hugo Moser. (*Id.*).

In 1952, Hugo Moser sold "The Marketplace at Pirna" to American collector Samuel H. Kress. (*Id.* at ¶40). In doing so, plaintiffs allege that Moser presented Kress with a completely fabricated provenance, omitting key information about where, when, and from whom he had purchased the painting. (*Id.* at ¶41). In 1953, Samuel H. Kress, through the Kress Foundation, placed "The Marketplace at Pirna" on long term loan with the MFA. (*Id.* at ¶42). And in 1961, the Kress Foundation converted the loan to an outright donation of the painting to the MFA. (*Id.*).

In 2019, the German Advisory Commission on the restitution of stolen war art ("the Commission") determined that Dr. Emden was a victim of the "systematic destruction of people's economic livelihoods by the Third Reich as a tool of National Socialist racial policy." (*Id.* at ¶45). Therefore, the Commission recommended that Mr. Emden's two Bellotto paintings that had been turned over to the new German government by the Monuments Men and Women be restituted to

4

plaintiffs as the sole heirs of Dr. Emden. (*Id.*).[2] The German government accepted the recommendation of the Commission and immediately returned both Bellotto paintings to the Emden heirs. (*Id.*). The Commission noted that the third Emden Bellotto, "The Marketplace at Pirna" at issue in this case, "was of the same origin [and] was erroneously restituted to the Netherlands after 1945 and is now considered lost." (*Id.*).

Thus, according to plaintiffs, but for the erroneous restitution of "The Marketplace at Pirna" to the Netherlands in 1946, and its subsequent restitution to Hugo Moser, "all three Emden Bellottos would have been together in Germany. (*Id.* at ¶46). And all three would have been returned to the Emden Heirs in accordance with the German Advisory Commission's findings and recommendation." (*Id.*)

In summer of 2021, researchers for the Monuments Men and Women Foundation discovered and analyzed a 1930 photo of "The Marketplace at Pirna," identifying a unique distinguishing fingerprint in the form of a "1025" marking. (*Id.* at ¶47). Said marking concretely distinguished the MFA-owned "The Marketplace at Pirna" from all imitations. (*Id.*) When presented with this finding in June of 2021, the MFA unequivocally refused restitution of "The Marketplace at Pirna." (*Id.* at ¶48). Plaintiffs filed their Complaint on October 12, 2021, seeking declaratory relief and alleging conversion and a violation of the Texas Theft Liabilities Act for unlawful appropriation of property. (*Id.* at 58-80).

---

[2] As already mentioned, Mr. Emden owned three Bellotto paintings in total; all of them were sold to Nazi dealer Karl Haberstock, and two of them were subsequently restituted to Germany. But only one of his paintings—"The Marketplace at Pirna" which was restituted to the Netherlands—is at issue in this case.

## II.    DISCUSSION

### A.  Legal Standard

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

In determining whether to grant a motion to dismiss, a court cannot look beyond the pleadings. *Peacock v. AARP, Inc.*, 181 F. Supp. 3d 430, 434 (S.D. Tex. 2016) (citing *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999)). However, when the motion to dismiss contains exhibits that are referenced in the plaintiff's complaint and central to the pleadings, they are part of the pleadings, and the court may consider them in ruling on the motion. *Johnson v. Bowe*, 856 F. App'x 487, 490-92 (5th Cir. 2021); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). A plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so. *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991)

(quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 at 762–63 (2d ed.1990)).

When a party presents "matters outside the pleadings" with a Rule 12(b)(6) motion to dismiss, the Court has discretion to accept or to exclude the evidence for purposes of the motion to dismiss. *Isquith ex rel. Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 194 n. 3 (5th Cir.1988). However, per Fed. R. Civ. P. 12(d), if documents outside of the pleadings are placed before a district court, and not excluded, the court must convert the defendant's 12(b)(6) motion to one for summary judgment and afford the plaintiff an opportunity to submit additional evidentiary material of his or her own. *Carter v. Stanton,* 405 U.S. 669, 671 (1972) (per curiam).

### B. Analysis

#### 1. The Act of State Doctrine

Under the Act of State doctrine, "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez,* 168 U.S. 250, 252 (1897). The doctrine is grounded in the principle that "juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government." *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 765 (1972). The doctrine thus overlaps in many respects with the political question doctrine, as it is rooted in constitutional separation-of-powers concerns. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 425 (1964). It recognizes "'the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of [United States] foreign policy.'" *Callejo v. Bancomer,* 764 F.2d 1101, 1113 (5th Cir. 1985) (quoting *First Nat'l City Bank,* 406 U.S. at 769).

"For Act of State [] purposes, the relevant acts are not merely those of the named defendants, but *any* governmental acts whose validity would be called into question by adjudication of the suit." *Callejo,* 764 F.2d at 1115, 1116 (emphasis added). The burden lies on the proponent of the doctrine to establish the factual predicate for the doctrine's application. *See Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694 (1976).

As described previously, plaintiffs claim that the Dutch government's receipt and subsequent restitution to Hugo Moser of "The Marketplace at Pirna" was the result of a clerical error by the Dutch. (Doc. 1 at ¶ 46.) Therefore, plaintiffs contend that the Dutch government's conveyance of the painting to Hugo Moser was of no effect because Mr. Moser did not have a true right of ownership or possession in the painting; it follows then, that Mr. Moser could not pass good title to the Kress Foundation, and the Foundation could not pass good title on to defendant. (Doc. 1 at ¶ 63). Defendant claims that plaintiffs' asserted ownership claims explicitly depend on this Court's invalidation of the Dutch government's official action when it restituted "The Marketplace at Pirna" to Hugo Moser; as such, the Act of State would prevent such invalidation by this Court.

i. *Portrait of Wally*

Plaintiffs offer *United States v. Portrait of Wally*, 663 F. Supp. 2d 232 (S.D.N.Y. 2009) as authority for the proposition that (1) there is a difference between "invalidating" the Dutch government's restitution of the painting and "determining its effect" on present ownership rights; and that (2) the Netherlands' restitution of "The Marketplace at Pirna" to Mr. Hugo Moser does not qualify as an "official act" for purposes of the Act of State doctrine. However, as the Court discusses in detail below, the "invalidation" versus "determination of effect" distinction does not apply to quiet title actions where the court is asked to nullify a foreign nation's conveyances. And

8

*Wally*'s "official act" factual predicates differ from the present matter in several dispositive ways, thus making the Ninth Circuit's holding in the factually-similar case *Von Saher v. Norton Simon Museum of Art at Pasadena*, 897 F.3d 1141 (9th Cir. 2018), far more apt persuasive authority.

In *Wally*, the controversy surrounded the proper ownership of a painting ('the *Wally*"), originally owned by a Jewish art collector and forcefully acquired by a Nazi dealer named Friedrich Welz. The parties disagreed about which Jewish art collector had owned the painting before its forceful acquisition: defendant Leopold Museum claimed the *Wally* had belonged to a Jewish dentist named Heinrich Rieger who sold it under duress to Mr. Welz; plaintiff heirs claimed that the painting had belonged to a Jewish gallery owner named Lea Bondi Jaray until Mr. Welz stole it from her. *Wally*, 663 F. Supp. at 236, 239-40.

After the war, U.S. forces gained possession of the *Wally*, among other works of art owned by Nazi dealer Friedrich Welz. *Id*. at 240. Counsel for Mr. Rieger's heirs wrote to the U.S. forces and to the Austrian government asking for the restitution of several paintings, but failing to mention the *Wally* by name, even though the letter mentioned other desired paintings by name. *Id*. The U.S. forces then released several paintings to the Austrian government to be held pending the determination of their ownership. *Id*. Eventually, the Austrian government restituted the *Wally* to the Rieger heirs, assuming it was part of the Rieger collection. *Id*. However, during this conveyance, the Austrian government never specifically referred to or identified the *Wally*. *Id*.

Later, the Rieger heirs negotiated a sale of the Rieger collection to the Belvedere, a national gallery owned by the Austrian government; the sale included the *Wally*, which again, was never explicitly referenced. *Id*. at 242. Years later, an Austrian citizen named Rudolph Leopold bought the *Wally* from the Belvedere, donating it to the newly established Austrian Leopold Museum in 1994. *Id*. at 245. The Leopold Museum loaned the *Wally*, along with other paintings, to the New

9

York Museum of Modern Art ("MoMA") in 1997. *Id*. at 246. After the MoMA exhibition had closed and the *Wally* was soon to be on its way back to Austria, the U.S. Government initiated a forfeiture action on behalf of the Bondi estate, alleging that the Leopold Museum imported and/or intended to export the *Wally*, while knowing that it was stolen from the Bondi estate. *Id*. at 246.

The *Wally* court began by holding that "[a]s a threshold matter, the Court is not being asked to *invalidate* any action by an Austrian governmental authority, but only to determine the effect of such action, if any, on *Wally* 's ownership." *Wally*, 663 F.Supp. at 248. In support of this holding, the *Wally* court cited *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Intern*. 493 U.S. 400 (1990), in which the Supreme Court held that "[t]he Act of State doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id*. at 409-10. Plaintiffs claim that in the present matter, as in *Wally*, the Court's determination regarding the effect of government action on ownership does not *invalidate* said government action, and thus does not implicate the Act of State doctrine.

However, even assuming sufficient factual similarity between *Wally* and the present matter—at least where the Court is being asked to determine proper ownership of a painting notwithstanding putative governmental action—we run into an issue. The *Wally* court's attempt to distinguish between "invalidation" and mere "determination of the effect" of a governmental action is directly contradicted by the facts of *W.S. Kirkpatrick*; there, the Supreme Court found it dispositive that, while plaintiff alleged that Nigerian government officials had unlawfully accepted bribes in exchange for a government contract awarded to defendant, plaintiff ". . . was not trying to undo or disregard the governmental action, but only to obtain damages from private parties who had procured [the unlawful government contract]." *Id*. at 407.

10

In contrast, *Wally* and the present matter ask the Court to determine whether a foreign government passed on good title to subsequent owners—i.e., whether the government's conveyance should be "undo[ne] or disregard[ed]." *Id*. On this point, the Supreme Court has long held that the Act of State doctrine applies to quiet title actions that require the court to nullify a foreign nation's official conveyances. *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 303–04 (1918); *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918)). Here, where the Emden plaintiffs ask this Court to render ineffective the Dutch government's restitution of "The Marketplace at Pirna" to Mr. Hugo Moser and thus invalidate the Museum of Fine Art's subsequent ownership claims, the Act of State Doctrine is implicated.

As a second basis for the inapplicability of the Act of State doctrine, the *Wally* Court pointed out that no official act of state seemed be in play because (1) the *Wally* was never legally transferred to the Rieger heirs pursuant to an official Austrian government determination of the painting's ownership; and (2) the Austrian government did not utilize Restitution Commission proceedings to dispose of *Wally*. 663 F.Supp. at 248. As already mentioned, the *Wally* was lumped together with the larger Rieger collection even though the Rieger heirs never explicitly claimed it in restitution proceedings. Thus, the *Wally* court held, the Austrian government's acquisition of the Rieger collection could not fairly be characterized as official state action determining the *Wally's* proper ownership, as the *Wally* was never even individually acknowledged during the transaction. *United States v. Portrait of Wally, A Painting By Egon Schiele*, No. 99 CIV. 9940 (MBM), 2002 WL 553532, at *8 (S.D.N.Y. Apr. 12, 2002).

Further, because the Austrian government side-stepped authorized Restitution Commission proceedings when it bought the *Wally* from the Rieger heirs then exchanged the *Wally* for one of Mr. Leopold's paintings, the court held that such acts were not "official acts" implicating the Act

11

of State doctrine. *See id*. ("The court is notably not being asked to review a decision by a Restitution Commission regarding the restitution of Wally.")

Here, where "The Marketplace at Pirna" was specifically requested by the Dutch government, then restituted to Hugo Moser per the Dutch Restitution Commission's determination of its ownership, the Act of State doctrine is implicated; indeed, plaintiffs' allegation that the Dutch government *mis*identified the painting does not undermine the Act of State doctrine's relevance to the present matter, particularly where plaintiffs do not allege that the Dutch agree about the claimed misidentification.

Finally, the *Wally* court found it "most important[]" that the balance of interests favored adjudication of the claim. *Id*. at 248. The court reiterated, "the Act of State doctrine is intended to prevent courts from inquiring into the validity of foreign acts where doing so would 'embarrass or hinder the executive in its conduct of foreign relations' and this concern is not implicated here, where both the executive branch actively seeks adjudication of its claim and Austrian law favors restoration of ownership." *Id*. at 248. As already mentioned, the *Wally* forfeiture action was brought by the U.S. Government on behalf of the Bondi estate; clearly, the executive branch was not concerned about the effect that its legal action would have on its conduct of foreign relations with Austria. The U.S. government is not a party to the present matter, and certainly has not indicated that application of the Act of State doctrine would not embarrass or hinder it in its conduct of foreign relations with the Netherlands.

For the above reasons, the Court finds *United States v. Portrait of Wally* to be inapposite. It now turns to *Von Saher v. Norton Simon Museum of Art at Pasadena*, 897 F.3d 1141 (9th Cir. 2018).

### ii. *Von Saher*

In *Von Saher*, plaintiff was the only living heir of a Jewish Dutch art dealer who was the victim of a forced sale of artworks to the Nazis. *Id*. at 1144. After the defeat of the Nazis, the artworks were restituted to the Dutch government by allied forces. *Id*. In 1949, plaintiff's family members declined to seek restitution of the stolen art, releasing any claim they had to the artworks. *Id*. at 1145. Therefore, in 1960, the Dutch government sold the artworks to a claimant named George Stroganoff-Sherbatoff ("Stroganoff") who claimed they had actually been stolen from him by the Soviets; the Dutch sold the works to Stroganoff on the condition that he would agree to drop his claims of restitution. *Id*. at 1147.

In the 1990s, plaintiff-heir Von Saher began seeking restitution of the artwork sold by the Dutch to Stroganoff (and later given to the Norton Simon Museum of Art in Pasadena) alleging, as the Emden plaintiffs do now, that the Dutch government erred by delivering the artwork to the wrong claimant. *Id*. at 1146. Seeking to recover the paintings, Von Saher sought declaratory relief and alleged conversion and various other causes of action, as do the Emden plaintiffs. *Id*. The matter went before the Ninth Circuit three times, twice on appeal of the lower court's grant of defendant's motions to dismiss (in 2010 and 2014), and the third and final time on appeal of the lower court's grant of defendant's motion for summary judgment (in 2018). The Court will refer to the Ninth Circuit's 2018 ruling as "*Von Saher*" and to its 2014 ruling as "*Von Saher II*". The 2010 ruling is not relevant to the present matter, as it does not touch on the Act of State doctrine.

One of the most important factual predicates for the Ninth Circuit's holding in *Von Saher* is the fact that the Dutch sale of the paintings to Mr. Stroganoff was pursuant to Dutch restitution proceedings. This factual predicate was so crucial that the *Von Saher II* court remanded the matter for further discovery on that point alone. *Von Saher v. Norton Simon Museum of Art at Pasadena,*

13

754 F.3d 712, 726 (9th Cir. 2014) ("If on remand, the Museum can show that the Netherlands returned the [paintings] to Stroganoff to satisfy some sort of restitution claim, that act could constitute a considered policy decision by a government to give effect to its political and public interests ... and so [would be] ... the type of sovereign activity that would be of substantial concern to the executive branch in its conduct of international affairs.") (internal citations omitted).

Ultimately, discovery led the Ninth Circuit to conclude that the sale from the Dutch government to Stroganoff was indeed "a part of the Dutch government's sovereign restitution process" and thus qualified as an "official act of the sovereign." *Von Saher,* 897 F.3d at 1149 ("[e]xpropriation of private property is a uniquely sovereign act."); *see, e.g., Oetjen v. Central Leather Co.,* 246 U.S. 297, 303 (1918) (applying the Act of State doctrine to governmental seizures of property). Here, no such discovery is needed as it is undisputed that Mr. Moser received "The Marketplace at Pirna" pursuant to the Dutch government's sovereign restitution process.

Having found that the conveyance to Stroganoff was an official act within the Act of State doctrine's definition, the Ninth Circuit then simply followed Supreme Court precedent which holds that the Act of State doctrine applies to quiet title actions that require the court to nullify a foreign nation's official conveyances. *Von Saher*, 897 F.3d at 1149 (citing *Oetjen v. Central Leather Co.*, 246 U.S. 297, 303–04 (1918); *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918)). Applying the precedent, the Ninth Circuit panel wrote,

> Von Saher's recovery hinges on whether she—not the Museum—holds good title to the paintings. The Museum's defense, in turn, depends on its having received good title from Stroganoff, who forfeited his own restitution claim to the paintings when he bought them from the Netherlands in 1966. It is therefore a necessary condition of Von Saher's success that the Dutch government's conveyance of the paintings to Stroganoff be deemed legally inoperative.

*Id*. at 1149.

Similarly, the Emden heirs' recovery hinges on whether they—not the Museum of Fine Arts—hold good title to the paintings. The Museum's defense, in turn, depends upon it having received good title from Samuel H. Kress, who bought the painting from Hugo Moser, who received it as restitution from the Netherlands in 1948. It is therefore a necessary condition of the Emden heirs' success that the Dutch government's conveyance of "The Marketplace at Pirna" to Moser be deemed legally inoperative.

### iii. Exceptions to the Act of State doctrine

Although there are exceptions to the Act of State doctrine, they do not apply here. First, as the Court has already discussed in detail, the Dutch government's restitution of "The Marketplace at Pirna" was a sovereign act. The exception for "purely commercial acts" therefore does not apply. *See Von Saher II*, 897 F.3d at 1154 (recognizing that "expropriation, claims processing, and government restitution schemes are not the province of private citizens"). Nor does the exception known as the "Second Hickenlooper Amendment," codified at 22 U.S.C. § 2370(e)(2). That exception applies only where there has been a "confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law[.]" 22 U.S.C. § 2370(e)(2). Here, the only alleged taking, which was not by defendant, occurred in 1938 during Emden's forced sale to a Nazi art dealer. Thus, this exception does not apply either.

### iv. Policy Considerations

Even where "the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the Act of State doctrine may not justify its application." *W.S. Kirkpatrick Co. v. Environ. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990). The Supreme Court laid out three such underlying policies in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964): "[1][T]he greater the degree of codification or consensus concerning a particular area

15

of international law, the more appropriate it is for the judiciary to render decisions regarding it .... [2][T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. [3]The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence."

First, "no one has identified an international consensus regarding the *invalidity* of the Dutch post-war restitution procedures." *Von Saher,* 897 F.3d at 1155. If anything, the U.S. State Department and Office of the Solicitor General expressed in their amicus brief in *Von Saher* that post-war restitution proceedings in the Netherlands were "bona fide." *See Von Saher II*, 754 F.3d at 729–30 (Wardlaw, J., dissenting).

Second, the State Department and Solicitor General's Office confirmed in their *Von Saher* amicus brief that upholding the Dutch government's restitution proceedings is important for U.S. foreign policy:

> When a foreign nation, like the Netherlands here, has conducted bona fide post-war internal restitution proceedings following the return of Nazi-confiscated art to that nation under the external restitution policy, *the United States has a substantial interest in respecting the outcome of the nation's proceedings*.

*Von Saher*, 897 F.3d at 1155 (emphasis added). This position makes practical sense. Reaching into the Dutch government's post-war restitution system would require sensitive political judgments that would undermine international comity. *See W.S. Kirkpatrick*, 493 U.S. at 408 (underscoring that "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations" are policies behind the doctrine).

Third, the Dutch government still exists.

16

Therefore, policy considerations weigh in favor of invocation of the Act of State doctrine in this matter.

### 2. Laches and Statute of Limitations

The Court does not reach the laches and statute of limitations arguments as they are mooted by the Court's finding regarding the Act of State Doctrine.

### 3. Plaintiff's Objections to Admission of Evidence

Plaintiffs object to the admission of (1) plaintiff counsel's 2006 and 2007 demand letters sent to the Museum of Fine Arts and (2) portions of defendants' exhibit 10, as appended to defendants reply in support of motion to dismiss.

As articulated above, documents that a defendant attaches to a motion to dismiss are considered part of the pleadings *if they are referred to in the plaintiff's complaint and are central to her claim. Collins v. Morgan Stanley Dean Witter* 224 F.3d 496, 498–99 (5th Cir. 2000) (emphasis added). When a party presents "matters outside the pleadings" with a Rule 12(b)(6) motion to dismiss, the Court has discretion to accept or to exclude the evidence for purposes of the motion to dismiss. *Isquith ex rel. Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 194 n. 3 (5th Cir.1988). However, per Fed. R. Civ. P. 12(d), if documents outside of the pleadings are placed before a district court, and not excluded, the court must convert the defendant's 12(b)(6) motion to one for summary judgment and afford the plaintiff an opportunity to submit additional evidentiary material of his or her own. *Carter v. Stanton,* 405 U.S. 669, 671 (1972) (per curiam).

Plaintiffs did not refer to the evidence to which they object in their complaint; therefore, the Court has not considered and will not consider such evidence at the motion to dismiss stage.

### III.  CONCLUSION

For the reasons set forth above and those stated on the record at the March 24, 2022, hearing, the Court **GRANTS** defendant's Motion to Dismiss without prejudice.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 2nd day of May, 2022.

                                        KEITH P. ELLISON
                                        UNITED STATES DISTRICT JUDGE